835 A.2d 330 (2003)
364 N.J. Super. 247
Robert G. ISETTS, Plaintiff-Appellant,
v.
BOROUGH OF ROSELAND; Borough of Roseland Department of Police, and in their official and individual capacities, Richard McDonough, Steven Sargese and Michael A. Pacio, Jr., jointly and severally, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued October 8, 2003.
Decided November 10, 2003.
*332 Daniel C. Fleming, Bedminster, argued the cause for appellant (Wong Fleming, P.C., attorneys; Mr. Fleming and Linda Wong, of counsel and on the brief).
David I. Fox, Livingston, argued the cause for respondents Borough of Roseland and Borough of Roseland Department of Police (Fox and Fox LLP, attorneys).
Gary S. Spagnola, Somerville, argued the cause for respondent Richard McDonough (Golden, Rothschild, Spagnola, Lundell, Levitt & Boylan, attorneys).
Kevin H. Marino, Newark, argued the cause for respondent Steven Sargese (Kevin H. Marino, P.C., attorneys; Mr. Marino and Wendy E. Gerstmann, on the brief).
Michael John Stone, Morristown, argued the cause for respondent Michael A. Pacio, Jr. (The Stone Law Group, attorneys).
Before Judges SKILLMAN, COBURN and FISHER.
*331 The opinion of the court was delivered by FISHER, J.A.D.
Plaintiff Robert Isetts filed a complaint against defendants, claiming violations of the New Jersey Conscientious Employee Protection Act (CEPA)[1]. That action was settled with plaintiff receiving $650,000 in exchange for a general release of "any and all claims, rights, actions and causes of action of any kind, both at law and equity" preceding the date of the release. Claiming that defendant continued to retaliate and harass him in violation of CEPA after the settlement, plaintiff filed this second action. Shortly after issue was joined, defendants successfully moved for an order prohibiting discovery regarding events preceding the settlement of the first action.
We granted leave to appeal and reverse.

I
Plaintiff is now a retired police officer, having formerly been employed by the Borough of Roseland Police Department. On January 24, 2000, plaintiff filed his first suit against defendants, alleging that because he objected to unlawful acts committed by various Roseland officials, he was subjected to retaliation and harassment in violation of CEPA. Among other things, it was claimed that defendants schemed to cause an involuntary transfer of plaintiff to a midnight shift in Newark even though it was known that plaintiff had received death threats because he had killed a Newark gang member during a crime spree in Roseland.
The parties eventually resolved their differences and executed a settlement agreement on March 5, 2001. Plaintiff received $650,000, accepted a paid leave of absence, and agreed to retire on September 1, 2001. Defendants agreed that they (1) would not interfere with plaintiff's pension rights in the Police and Fire Retirement System (PRFS), (2) answer any inquiry about plaintiff's employment only with the date of his employment, highest rank held and his retirement in good standing effective September 1, 2001, (3) would only have "inadvertent contact" with plaintiff thereafter, and (4) would not interfere with plaintiff's right to retain his service revolver after retirement.
*333 Plaintiff also provided defendants with a general release which states, in relevant part:
Plaintiff ... releases and gives up any and all claims, rights, actions and causes of action of any kind, both at law and equity, which he has, had or may have against the [non-settling defendants]. This General Release by plaintiff of all claims includes those of which he is not aware and those which are not specifically mentioned in this General Release. This Release applies to all claims resulting from anything that has happened up to the date of its execution by plaintiff. Plaintiff specifically releases these defendants from any and all claims, rights, actions and causes of action that were asserted or could have been asserted
...
At the time of the settlement, very little discovery had occurred; plaintiff was deposed for a few days and written discovery requests and answers were exchanged, but the great bulk of discovery remained uncovered.
On March 7, 2002, almost exactly one year after the execution of the settlement agreement and release, plaintiff commenced the current action, claiming that "[a]lmost immediately after the entry of the settlement agreement," defendants Richard McDonough (McDonough) and Steven Sargese (Sargese) engaged in a course of conduct "violative of nearly every material term of the settlement agreement" and in retaliation for plaintiff's first lawsuit and his receipt of substantial monetary benefits in settlement of it. According to the complaint in the second lawsuit, (1) McDonough and Sargese met with a state investigator to report plaintiff's alleged misconduct eight years earlier, knowing it could result in a forfeiture of plaintiff's PFRS pension; (2) Roseland made a unilateral deduction from plaintiff's paycheck; (3) McDonough, and others at McDonough's direction, tortiously interfered with plaintiff's employment with Enforsys during the term of his paid leave of absence, which ultimately forced plaintiff's resignation from Enforsys; (4) McDonough and others stalked and harassed plaintiff in July and September 2001 by following him within the boundaries of Roseland and, at times, beyond; (5) McDonough made statements to the New Jersey State Police expressing reservations about plaintiff's gun permit application and engaged in other efforts to hamper, delay or defeat the application; and (6) defendants unnecessarily delayed issuance of plaintiff's retired police identification card. Based on these and other contentions, plaintiff alleged causes of action based upon CEPA and 42 U.S.C. §§ 1983 and 1985, as well as tort and fraud claims.

II
Defendants moved for an order narrowing the issues, specifically seeking to bar plaintiff from discovery of any matters which occurred prior to the settlement. Defendants acknowledge, and the motion judge correctly agreed, that the settlement agreement and release did not prohibit plaintiff from asserting his present claims.
The motion judge, however, also agreed with defendants that the inclusion of the word "rights" in plaintiff's release of "any and all claims, rights, actions and causes of action of any kind, both at law and equity" included the waiver of the right to seek discovery of events preceding the settlement, explaining:
In coming to my ultimate conclusion the Court relies on Dart [Indus. Co., Inc. v. Westwood Chem. Co., 649 F.2d 646 (9th Cir.1980) ] in that the discovery now sought was a right plaintiff waived. Very much here as in Dart defendants bought their peace in exchange for terminating *334 discovery.... [I]t's the Court's opinion [that] the intent of settlement [is that] the defendants now shouldn't be sucked back into a morass of discovery that's been waived. This quite frankly in this Court's opinion is one purpose of settlement, and ... settlements [are] looked upon with favor by the Courts.
As a result, the motion judge entered an order restricting discovery to events occurring after March 5, 2001, the date of the settlement. The order also barred the admission of evidence relating to events occurring prior to March 5, 2001.

III
Defendants urge that the release created a brightline between what is and what is not discoverable in the current lawsuit. They claim that by making a substantial payment to plaintiff to settle the first lawsuit they bargained for peace, including peace from further discovery of events and information preceding the settlement. Defendants have not supported this interpretation with sworn statements or extrinsic evidence to illuminate the release's meaning. Instead, defendants argue that the plain and ordinary meaning of the words of the release compels a broad interpretation permitting the permanent concealment of pre-settlement events and information from plaintiff's inquiries. Defendants also argue that even if the motion judge's impassable discovery cut-off date cannot be sustained, there should be limitations imposed on future discovery proceedings so that they are not overly or unduly burdened or harassed.
As a general matter, discovery rulings will not be reversed absent an abuse of discretion. Payton v. New Jersey Tpk. Auth., 148 N.J. 524, 559, 691 A.2d 321 (1997). However, an "interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Township Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995). Here, the motion judge prohibited pre-settlement discovery because of her interpretation of the settlement agreement and release and not through an exercise of discretion. Accordingly, we review the discovery limitations imposed without any special deference.

IV
In seeking a broad interpretation of the release, defendants urge, first, that the settlement agreement is enforceable and that this State's public policy greatly favors settlements. This is true, but not relevant.
That the settlement of litigation "ranks high in our public policy," Nolan v. Lee Ho, 120 N.J. 465, 472, 577 A.2d 143 (1990), only places this particular dispute in its setting. It does not mean that courts will rewrite or unduly expand settlement agreements in order to deem settled or waived things not legitimately encompassed. The settlement of lawsuits is favored not because of the salutary consequence of relieving "our overtaxed judicial and administrative calendars"a benefit which seems to inform defendants' erroneous view of this agreementbut because of
the notion that the parties to a dispute are in the best position to determine how to resolve a contested matter in a way which is least disadvantageous to everyone. In recognition of this principle, courts will strain to give effect to the terms of a settlement wherever possible. It follows that any action which would have the effect of vitiating the provisions of a particular settlement agreement and the concomitant effect of undermining public confidence in the *335 settlement process in general, should not be countenanced.
[Dep't. of Pub. Advocate v. N.J. Bd. of Pub. Util., 206 N.J.Super. 523, 528, 503 A.2d 331 (App.Div.1985).]
While defendants contend that this approach requires a broad interpretation of the settlement agreement and release, in fact the policy in favor of settlement suggests only that the court should view the release with an assumption that the parties intended to terminate the then existing lawsuit.
Here, plaintiff has not argued that some cause of action which then existed may still be pursued notwithstanding the settlement; plaintiff acknowledges that all claims existing at the time of the settlement have been extinguished by way of the release. Plaintiff seeks only to pursue a cause of action which arose after the settlement and which defendants concede was not encompassed by the settlement. And defendants contend that while the release does not prohibit the prosecution of the current lawsuit, the scope of discovery in the current lawsuit is limited by the terms of the release. Under either defendants' or plaintiff's interpretation of the release, the first lawsuit will remain terminated and the second lawsuit will still be maintainable. Accordingly, the public policy favoring settlements, so vehemently urged by defendants, is not implicated by the order in question.
Defendants also argue that by commencing this second lawsuit and seeking discovery relating to the claims asserted in the first lawsuit plaintiff is seeking a rescission of the settlement agreement. However, the amended complaint in the current lawsuit contains no suggestion that plaintiff is seeking to undermine the terms of the settlement agreement or return the parties to their pre-settlement status. Defendants misconceive plaintiff's claims that defendants have breached various aspects of the settlement agreement as being tantamount to a claim for rescission of the settlement agreement. Even if rescission was a remedy plaintiff could have sought, the amended complaint in this action does not contain such a demand.
We are also not presented with a situation where a party to a settlement agreement is attempting to avoid or undo a settlement which, upon reflection, is no longer desired. See Raroha v. Earle Finance Corp., 47 N.J. 229, 233-34, 220 A.2d 107 (1966); Dep't. of Pub. Advocate, supra, 206 N.J.Super. at 530, 503 A.2d 331. Plaintiff acknowledges that he cannot recover against defendants on any of the claims asserted in the first lawsuit. Accordingly, while it would have been relevant to a consideration of the validity of the order under review, the pleadings disprove defendants' contention that plaintiff seeks to avoid the terms of the settlement. To the contrary, plaintiff seeks damages based on his claim that defendants have not lived up to their part of that bargain.
We thus consider the meaning of the settlement agreement and release not with regard to the public policy in favor of settlement, and not with regard to the misconception that plaintiff seeks rescission of the settlement, but in light of the only evidence provided to the motion judgethe wording of the settlement agreement and the release.

V
Both the settlement agreement and the release describe those things which plaintiff waived or released as "any and all claims, rights, actions and causes of action of any kind, both at law and equity, which he has, had or may have had against any of the defendants." In parsing the release's critical passage, we certainly *336 agree that the phrase "any and all" allows for no exception, see Atlantic Cas. Ins. Co. v. Interstate Ins. Co., 28 N.J.Super. 81, 91, 100 A.2d 192 (App.Div.1953) ("[t]he word `any' clearly may and should be interpreted as meaning `all or every'"), but only with regard to those types of things thereafter mentioned. That is, plaintiff only surrendered "any and all" of his existing "claims, rights, actions and causes of action." The issue, accordingly, turns on whether the "right" to seek discovery in a later unreleased action is a "claim," a "right," an "action" or "a cause of action." Plaintiff contends that the right to seek discovery in a future, unreleased action does not fall within any of these terms since discovery went unmentioned, whereas defendants contend that the right to seek such discovery falls within the word "right" as used in the release.
We proceed with a consideration of the plain and ordinary meaning possessed by a word such as "right." M.J. Paquet, Inc. v. New Jersey Dep't of Transp., 171 N.J. 378, 396, 794 A.2d 141 (2002). This, however, proves frustrating in that the word "right," when considered in a vacuum, could convey many different meanings. Even in a legal sense, a polysemous word such as "right" requires further modification in order to convey any sensible meaning. Without modification derived from accompanying words, a broad view of the word "right" can lead to absurd results. For example, did this release intend to cause the waiver of "natural rights" or "civil rights"? Can it be rationally argued that plaintiff intended to waive his "right" to life, liberty and the pursuit of happiness? While it is more likely that the parties intended to limit the term to "property rights," these too can take many forms, as a cursory review of any legal dictionary will reveal.[2] As a result, we view a resort to dictionaries for the correct meaning of this word to be illusory and, in the final analysis, worthless.[3]Cabell v. Markham, 148 F.2d 737, 739 (2nd Cir.) ("[I]t is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary"), aff'd, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945).
Instead, in the absence of any evidence of the mutual intentions of the parties to the agreement and release, we must interpret the meaning of the word "right" by reference to the context in which it appears. That is, we should be guided by the canon of construction which suggests that "the meaning of words may be indicated and controlled by those with which they are associated." Germann v. Matriss, 55 N.J. 193, 220, 260 A.2d 825 (1970); see Herzog v. Township of Fairfield, 349 N.J.Super. 602, 607, 794 A.2d 230 (App. Div.2002). This doctrine, noscitur a sociis[4], while not an absolute rule, serves "as a helpful guide in ascertaining the intended scope of associated words or phrases." Germann, supra, 55 N.J. at 221, 260 A.2d 825. It is a maxim "wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth" to contract provisions. Jarecki v. *337 G.D. Searle & Co., 367 U.S. 303, 307, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961).
Another helpful rule of contract construction suggests that "when general words follow specific words ... the general words are construed to embrace only the objects similar in nature to those objects enumerated by the preceding specific words." Stryker Corp. v. Dir., Div. of Taxation, 168 N.J. 138, 155-56, 773 A.2d 674 (2001) (quoting State v. Hoffman, 149 N.J. 564, 584, 695 A.2d 236 (1997)). This doctrine, ejusdem generis[5], is also not an absolute rule but another guide often applied to gain insight into the meaning of contracts. See Cooper Distrib. Co., Inc. v. Amana Refrigeration, Inc., 63 F.3d 262, 280 (3rd Cir.1995) (applying New Jersey law). The court in Sky Harbor Air Serv. v. Airport Auth. of Omaha, 174 Neb. 243, 246-47, 117 N.W.2d 383, 385 (1962) demonstrated the proper application of this maxim. There, the court considered the meaning of "the elements" in a lease provision which placed a duty on the lessor to repair damage caused "by fire, the elements, floods, tornadoes ... or by Act of God." The court found that damage caused by the "normal action" of the weather was not encompassed because the broader potential meaning of "the elements" should be, in light of its context, limited to a narrow meaning consistent with "floods" and "tornadoes." Ibid. In short, through the application of this canon, "general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned." Abeles v. Adams Eng'g Co., Inc., 64 N.J.Super. 167, 176, 165 A.2d 555 (App.Div.1960), mod., 35 N.J. 411, 173 A.2d 246 (1961).
The words and phrases which accompany the word "rights" in the release in question generally describe the same thing. That is, "claims," "actions," and "causes of action" tend to connote the same meaning in this context, namely, affirmative claims for relief possessed by the releasor against the releasee. Accordingly, we view the word "rights" as having the same or similar limited meaning not only because it is in the company of these other words but also because its potentially broader meanings should be tailored to the more limited meaning of its neighbors. Of the many potential definitions which might be assigned to the word "right," its associated words suggest that it should be limited to the "right" to make a "claim" or assert a "cause of action," and should not be interpreted as including the "right" to seek discovery which would otherwise attach to a later unreleased claim.
In arguing for a contrary interpretation, defendants place great reliance upon Dart, which was also exclusively relied upon by the motion judge. We reject Dart's holding, finding that it expresses an unnatural and tortured interpretation of a similar release. The facts necessary to an understanding of Dart should be briefly described. Westwood Chemical Company, Inc. (Westwood) brought suit in the Southern District of New York against two former employees, alleging they conspired with Synthetic Products Company (Synthetic), a Dart subsidiary, to cause the termination of Westwood's sales agency agreement with Synthetic. Dart was not a party to the New York suit because it reached a settlement with Westwood; the settlement required Dart's payment of $700,000 and Westwood's delivery of a release. The release stated that Westwood "releases and discharges" Dart and Synthetic "of any rights it has or may hereafter *338 have by reason of" the alleged conspiracy with the former Westwood employees. Id. at 648.
Westwood commenced an ancillary action in the Central District of California seeking the issuance of a subpoena to compel the deposition of a Dart officer. The district court refused relief. On appeal, the parties debated whether Westwood's release "of any rights it has or may hereafter have" in favor of Dart barred Westwood's right to seek discovery from Dart for purposes of Westwood's suit against its former employees. Ibid. In a 2-1 decision, the Court of Appeals for the Ninth Circuit held that the release was "clear," required "no amplification," and meant that Westwood "gave up everything." Ibid. The majority held that to find the release to be ambiguous, or to find that it unambiguously excluded a right of discovery, would be "nothing short of rewriting the agreement and emasculating it." Id. at 649.
In dissent, Circuit Judge Anderson observed that the general release expressly excepted from its scope Westwood's claim against its former employees, thus making it clear to Dart that such a suit would be commenced. As an alleged co-conspirator with these former employees, Dart must have understood that Westwood would seek discovery from Dart. The fact that the release did not specifically mention a waiver of that discovery, in Judge Anderson's view, either rendered the release ambiguousrequiring elucidation through a hearingor unambiguously did not release the right to seek discovery from Dart.
Like the dissenting judge, we find Dart's holding to be erroneous. We also note that a decision involving the same parties and subject matter as DartWestwood Chem. Co., Inc. v. Kulick, 656 F.2d 1224 (6th Cir.1981)was highly critical of Dart. There, Westwood commenced another ancillary action in the Northern District of Ohio to depose other Dart executives. This time the Sixth Circuit found that res judicata required adherence to Dart and an affirmance of the suit's dismissal even though it concluded that Dart was wrongly decided:
We reach this decision even though we believe that the Ninth Circuit and the Ohio District Court's construction of the release agreement is erroneous. On the merits of the case we are aligned with Judge Anderson's dissent. As he there points out, if the agreement is unambiguous then the majority's interpretation is incorrect, since the agreement neither discusses nor mentions discovery. The right to depose an employee or officer of a company as a non-party witness to use against defendants in another suit is not a claim against that company. And if the agreement is ambiguous, an evidentiary hearing was required to determine the intent of the parties in view of the admission that Westwood retained its right to sue [its two former employees].
[656 F.2d at 1231.]
We agree with the Sixth Circuit's interpretation of the release in Dart and conclude that the motion judge's reliance upon Dart was erroneous. Accord In re American Sweeteners, Inc., 248 B.R. 271, 280-81 (Bankr.E.D.Pa.2000) (distinguished Dart and held, in circumstances similar to the case at hand, that a broad release would not encompass a waiver of discovery of pre-settlement matters in a post-discovery suit); TAG Group S.A. v. Haas and Haynie Corp., 637 F.Supp. 121, 123 (S.D.N.Y. 1986) ("[o]ne lesson that can be drawn from [the Sixth Circuit's] disapproval [of Dart ] is that the decision in Dart should be strictly confined to its facts.").
We conclude that a general release which does not expressly include a waiver of discovery cannot serve to limit the scope of discovery in the future pursuit *339 of an unreleased claim. Since defendants concede that the release does not bar the present suit, we must conclude that, by failing to refer to discovery in future actions, the release does not limit the discovery rights inherently appended to the present suit.

VI
Apparently recognizing the fallacy of an impassable line drawn at the settlement date of the first action, between what is and what is not discoverable, defendants have also argued that pre-settlement information and events are not relevant to the current action. We reject this contention as well.
In the second suit plaintiff primarily alleges CEPA and civil rights violations. It is well-established that in such actions evidence of prior bad acts, or evidence designed to demonstrate an improper motive, may be admissible. Rendine v. Pantzer, 276 N.J.Super. 398, 426-28, 648 A.2d 223 (App.Div.1994), aff'd in part, rev'd in part on other grounds, 141 N.J. 292, 309, 661 A.2d 1202 (1995); Connolly v. Burger King Corp., 306 N.J.Super. 344, 703 A.2d 941 (App.Div.1997). While N.J.R.E. 403 may require a weighing of the probative value of such evidence against its prejudicial effect, Rendine, supra, 276 N.J.Super. at 427, 648 A.2d 223, our present concern is not with whether N.J.R.E. 404(b) material is evidentiary in this case but whether such information is discoverable.
Broad discovery and liberal procedures for discovery, as Chief Justice Vanderbilt said in Lang v. Morgan's Home Equipment Corp., 6 N.J. 333, 338, 78 A.2d 705 (1951), "are essential to any modern judicial system in which the search for truth in aid of justice is paramount." As a result, our rules expansively declare that a party "may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action," and it is not "ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." R. 4:10-2(a).
The claims asserted in this case form a legitimate basis for discovery of pre-settlement occurrences and information which might demonstrate prior bad acts or suggest a motive for defendants' alleged improper actions. While we cannot presently say whether such evidence, to the extent it may exist, would be admissible at trial, we can say that there is no reason, on the present record, to question the discoverability of such information.
We caution, however, that the potential relevance of evidence relating to events which formed the basis for the prior suit does not necessarily mean that the parties have an unfettered right to duplicate the same discovery which could have been obtained during the course of the first suit had it not been dismissed. Defendants have voiced a concern that they will be dragged into endless days of depositions and other extensive discovery relating only to the alleged prior bad acts which, while potentially relevant, need not play a primary role in the current suit. We share these concerns. While prior bad acts and motive may be relevant and may be gleaned from the events which formed the basis for the first suit, they should not be permitted to "wag the dog" or overwhelm the discovery proceedings in the current suit.
On this limited record, we cannot possibly discern how extensive discovery into pre-settlement matters should be. At present, we can only commend to the motion judge her discretion to limit discovery, if necessary, in order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." R. 4:10-3; see James v. Chevron U.S.A., Inc., 301 N.J.Super. 512, 546, 694 A.2d 270 *340 (App.Div.1997), aff'd sub nom., James v. Bessemer Processing Co., 155 N.J. 279, 714 A.2d 898 (1998). If pre-settlement discovery begins to unduly or unnecessarily overtake the post-settlement discovery in amount or intensity, the motion judge possesses the discretion, to be soundly exercised, to direct that discovery be limited. R. 4:10-3; Connolly, supra, 306 N.J.Super. at 350, 703 A.2d 941.

VII
Because we conclude that the motion judge misinterpreted the settlement agreement and release, the order of April 4, 2003 is reversed insofar as it bars discovery of claims and allegations that occurred before March 5, 2001, and vacated insofar as it limits the evidence at trial to events that occurred after March 5, 2001. We remand for further proceedings in conformity with this opinion.
NOTES
[1] N.J.S.A. 34:19-1 to -8.
[2] For example, Black's Law Dictionary refers to in personam rights, in rem rights, primary rights, secondary rights, preventive rights, protective rights, remedial rights, reparative rights, absolute rights, qualified rights, legal rights, equitable rights, marital rights, patent rights, private rights, public rights, riparian rights and vested rights. Black's Law Dictionary 1486-88 (4th ed., 1968).
[3] For example, fifty-two separate definitions for "right" can be found in The Oxford English Dictionary 922-931 (2d ed., 1989) and fifty-four in Webster's Third New International Dictionary 1955 (1993).
[4] Noscitur a sociis literally means: "it is known from its associates."
[5] Ejusdem generis literally means: "of the same kind."