38 A.3d 591

JULIA GERE, FORMERLY KNOWN AS JULIA GERE RICKER, PLAINTIFF-APPELLANT, v. FRANK A. LOUIS, ESQ., AN ATTORNEY AT LAW OF THE STATE OF NEW JERSEY, LOUIS, ROE & WOLF, ESQS., AND LOUIS, STOLFE & ZIEGLER, ESQS., DEFENDANTS, AND JOHN DEBARTOLO, ESQ., AN ATTORNEY AT LAW OF THE STATE OF NEW JERSEY, AND ATKINSON & DEBARTOLO, P.C., DEFENDANTS-RESPONDENTS.

Argued November 7, 2011—Decided March 6, 2012.

*Diane Marie Acciavatti* argued the cause for appellant.

*Dianna L. Daghir–McCarthy* argued the cause for respondents (*Winget, Spadafora & Schwartzberg,* attorneys; *Ms. Daghir–McCarthy* and *Scott B. Tenenbaum,* on the brief).

*Christopher J. Carey* argued the cause for amicus curiae New Jersey State Bar Association (*Susan A. Feeney,* President, *Kalison, McBride, Jackson & Robertson,* and *Graham Curtin,* attorneys; *Richard H. Steen,* of counsel; *Mr. Carey, Mr. Steen, Robert B. Hille, John W. Kaveney, Theodore H. Hilke* and *Amirali Y. Haidri,* on the brief).

Judge WEFING (temporarily assigned) delivered the opinion of the Court.

We granted certification in this matter to consider whether plaintiff's legal malpractice claim is barred under *Puder v. Buechel,* 183 *N.J.* 428, 874 *A.*2d 534 (2005), when, as part of her resolution of a property dispute with her former spouse, plaintiff entered a settlement agreement that included a reservation of rights to sue her former attorneys. The Appellate Division, in an unpublished opinion, affirmed an order of the trial court that dismissed plaintiff's legal malpractice claim, finding it barred under *Puder.* Because we deem this situation to be distinguishable from that which we considered in *Puder,* we conclude that her malpractice action is not barred. We thus reverse the judgment of the Appellate Division and remand this matter for further proceedings.

## I.

Plaintiff Julia Gere was married to Peter Ricker for more than thirty years; eventually, in 1997, they commenced divorce proceedings that were, unfortunately, acrimonious. The couple had acquired substantial assets over the course of their marriage, and they finally resolved the economic issues attendant to their divorce proceedings in a property settlement agreement dated March 13,

2000. Each of the parties was represented by sophisticated counsel in connection with the negotiation, preparation, and execution of that property settlement agreement. Plaintiff had the assistance of an accountant and a financial adviser as well.

Under the property settlement agreement, plaintiff was to receive alimony for a fixed term of seven years, in the set amount of $250,000 per year. The parties agreed that the amount of that alimony could neither be increased nor decreased and that the seven-year period could not be extended.

The agreement further provided in great detail for the equitable distribution of the parties' various assets. Article 17 of the agreement dealt with what they referred to as "Ancillary Real Estate Investments." Article 17.1(a) provided in pertinent part:

> The parties acknowledge having acquired interest [sic] in various parcels of real estate .... [Plaintiff] shall have a period of 6 months from 4–1–2000 ... to review all financial records concerning these investments.... Prior [to] the expiration of six months, [plaintiff] shall be required to notify [Ricker] of her decision concerning the status of these investments. If [plaintiff] determines she no longer wishes to [ ] remain an equal partner in these assets, then and in that event, she shall relinquish any and all claims, legal or equitable, as to the distributability of these properties .... In the event [plaintiff] opts to waive her interest in these assets, then and in that event, [Ricker] shall fully and completely indemnify [plaintiff] as to any obligations arising out of these assets.

Article 17.3 provided in further pertinent part:

> In the event [plaintiff] fails to notify [Ricker] in writing within the six month[ ] period subsequent to final execution of this Agreement, then and in that event, the parties shall maintain these assets jointly and equally in a fashion to be set forth in a Partnership Agreement consistent with all of the terms and conditions of [Ricker's] present partnership agreement to be prepared at that time....

Defendant Louis was the attorney who represented plaintiff in the divorce proceedings and the negotiation of the property settlement agreement. He testified in his deposition that the property settlement agreement included this six-month window for plaintiff to decide how she wished to proceed with respect to these ancillary real estate investments. The six-month period would allow plaintiff to consider the economic implications of whatever choices she made as well as to consider whether she wished to remain in any business relationship with Ricker at all. Plaintiff's

understanding of these provisions was that she would retain a one-half interest in all of her former husband's interest in the ancillary real estate investments unless she affirmatively advised him within six months that she did not wish to do so.

One of the assets included under the umbrella term "Ancillary Real Estate Investments" was Navesink Partners, LLC (Navesink Partners), which owned a marina. The assets of Navesink Partners included three tracts of land on which stood a restaurant, a two-story office building, a boat-repair shop, and a parking area. The land also held two marinas, one of which had 126 boat slips, the other nine. In addition to this real estate, Navesink Partners also owned and operated the business operations of the marina, such as repairs, fuel services, storage, leasing, and related activities.

Under 17.1(a) and 17.3 of the property settlement agreement, plaintiff was to notify Ricker in October 2000 of her decision with respect to these various ancillary investments.

On October 4, 2000, Ricker, not having heard from plaintiff, wrote to defendant Louis to request a written statement with respect to her decision regarding these assets. Upon receipt of this letter, Louis called plaintiff to inquire with respect to her decision.

Louis's call was answered by plaintiff's friend John Hope, on whom, Louis knew, plaintiff relied for advice. Louis testified in his deposition that in light of the close relationship between plaintiff and Hope, he viewed his conversation with Hope as the equivalent of a conversation with plaintiff. He asked Hope whether plaintiff had made a decision with respect to the marina, and Hope responded, "real estate, yes, marina, no." In his deposition, Louis was not certain whether he spoke directly to plaintiff during this conversation or whether he relied solely on Hope's response. Nor did he recall any discussion about the fact that one entity owned both the business operations of the marina and the land on which it was located.

Hope submitted a certification detailing his recollection of this telephone call. He said that Louis did not speak to plaintiff and did not ask to do so and, further, that he was never authorized to make any decisions on plaintiff's behalf. Hope said his understanding, and plaintiff's understanding, was that by the time of this telephone call, the six-month period had already expired, with the result that plaintiff held a one-half share of her husband's interest in these various real estate investments, including Navesink Partners. Hope said the thrust of what he communicated to Louis in this conversation, which he characterized as "short" and "abrupt," was that plaintiff wished to retain her interest in the marina's real estate but to be bought out with respect to its business operations.

Based on his interpretation of Hope's response, Louis prepared the following letter dated October 11, 2000, for Ricker's attorney: "In accordance with the option provided Julia Ricker under the real estate portion of the Property Settlement Agreement, this will confirm that except for the Marina, Mrs. Ricker wishes to maintain one-half interest in all other properties." He did not send a draft of this letter to either plaintiff or Hope before he sent it to Ricker's attorney.

Plaintiff testified in a deposition that she did not speak to Louis during his telephone conversation with Hope and did not even hear Hope speaking with him. In a deposition she was asked whether she had authorized Louis to send the October 11, 2000, letter and she responded, "Yes, I guess," but in a subsequent hearing she testified that she had been under stress during that earlier deposition and that in fact she had not authorized Louis to send that letter.

Approximately one year and two months after Louis sent this letter, he again wrote to Ricker's attorney, addressing certain issues that remained open between the parties. In this subsequent letter, dated December 17, 2001, he noted that plaintiff wanted "to terminate her business relationship with [Ricker] concerning the other assets. We need to establish a methodology

for her equitable interest in these assets to be acquired or alternatively agree that assets are to be sold." This formulation reflected Hope's later certification that plaintiff wanted to retain an interest in the marina's underlying real estate but not its business operations. Louis copied plaintiff on this letter.

Louis heard from Ricker himself in response to this letter and then wrote to plaintiff, relaying to her the substance of his conversation with her former husband. Louis noted that Ricker was taking the position that plaintiff had relinquished her rights in the marina and that Louis had informed Ricker that plaintiff did not agree with that view.

The parties' disputes with respect to this and certain other aspects of the property settlement agreement led to post-judgment litigation in which Ricker maintained that plaintiff had waived any interest in Navesink Partners, and plaintiff contended that she had not. Rather, she asserted she retained her interest, wanted to continue her ownership interest in the real estate, and was entitled to have her interest in the marina's business operations bought out at fair value. When it became clear that one of the disputed issues in this post-judgment litigation was the meaning of Louis's letter of October 11, 2000, and whether plaintiff had authorized its issuance, Louis withdrew from his representation of plaintiff and was succeeded by defendant John DeBartolo, Esq.

During the course of the post-judgment proceedings, plaintiff submitted a certification dated September 30, 2002, in which she stated:

> The October 11th letter specifically refers only to the marina, i.e. the *business*, as distinct from the real estate .... When I exercised the option on October 11th, it was to avoid the risks associated with the operation of the business he [i.e., Ricker] emphasized prior to execution of the Agreement .... That option was designed to limit my financial risks thus I opted not to participate in the business ....

She also submitted a certification dated July 10, 2003, in which she stated:

> Under no circumstances was this [October 11, 2000] letter ever intended by me, nor more importantly authorized by me, to waive any interest I had in the marina real estate. At the very most, this letter expressed, rather inartfully, my request as an

owner of the real estate partnership that I did not want to be a business partner with [Ricker] in the marina.... While I was willing to ride out the natural lifespan of the partnerships in Sea Bright properties and Panther Valley, I was not willing to engage in an endless partnership that involved the operation of the marina business. On October 1, 2000, I was the joint and equal owner of the partnership interest with [Ricker]. The intent of the Louis' letter was to advise the plaintiff of my desires to end the business. .

The parties agreed to the entry of a consent order that provided for a sixty-day period for discovery for the post-judgment litigation. Following the expiration of that sixty-day period, the parties filed cross-motions for summary judgment. The trial court denied the motions, noting on the orders entered in August 2003 that the question of the nature of plaintiff's ownership interest, if any, in these investments required a plenary hearing.

For reasons that are not apparent from the record before us, the plenary hearing was not scheduled until 2006. Shortly before that plenary hearing was to commence, Carl Soranno, Esq., succeeded defendant DeBartolo as plaintiff's attorney. By that time, the discovery period had long since expired. In connection with this litigation, Soranno submitted a certification that when he received the file from DeBartolo, he found it "surprisingly small." On reviewing the file, he learned that no discovery had been conducted with respect to whether plaintiff had waived or retained an interest in Navesink Partners. He also learned that Louis was unable to locate his correspondence files for the period during which he represented plaintiff. As a result, the only correspondence available to Soranno to aid his preparation for the plenary hearing were those letters on which Louis had copied plaintiff and that plaintiff, in turn, was able to locate. While the trial court did accede to Soranno's entreaties and permit him to engage in certain restricted discovery, it did not allow him the discovery he would have undertaken at the outset and also directed that any such permitted discovery had to take place as the plenary hearing progressed.

The plenary hearing commenced on April 12, 2006, and spanned eight separate days, concluding on October 12, 2006. On September 29, 2006, Soranno, concerned that the matter might not be

concluded by October 11, 2006, the six-year anniversary of Louis's letter to Ricker's attorney, sent a letter to Louis requesting that he enter a tolling agreement with plaintiff. Louis signed the letter, agreeing that the statute of limitations for initiating a malpractice claim against him was tolled through and including January 9, 2007.

The trial court did not issue an opinion immediately upon the conclusion of the plenary hearing, and plaintiff requested that Louis sign another tolling agreement, through May 11, 2007. Although Louis did not sign that letter, plaintiff's counsel asserted that Louis had left a voicemail in which he said he would sign the second tolling agreement. The trial court later found that the period of limitations was equitably tolled up to May 11, 2007.

On July 27, 2007, prior to the trial court issuing its decision with respect to the question of waiver, the parties achieved a settlement and placed their settlement on the record. This July 2007 settlement was intended to supplement, rather than to replace, their original property settlement agreement. This supplemental agreement provided that as of January 1, 2007, plaintiff would have a one-half interest in Ricker's ownership in the real estate portion of the marina and a forty percent interest in his ownership of the business operations portion of the marina. If the matter had proceeded through the trial court issuing an opinion, and the court had concluded that plaintiff had not waived her interest, she would have a fifty percent interest in both the real estate and the operations as of 2000. If, on the other hand, the trial court had concluded that plaintiff had waived her interest in this asset, she would receive nothing. In short, plaintiff agreed to receive a reduced interest to avoid the risk of the trial court finding she was not entitled to anything.

In conjunction with this settlement, the parties executed a settlement document, exchanged releases, and placed the terms of their agreement on the record before the trial court. Certain of those terms give rise to the dispute before this Court and must be set forth in detail. After setting forth those claims plaintiff was

releasing against her former husband, the document she executed contained the following limitation:

> However, nothing in this release shall prevent me from pursuing claims against third parties, including my former attorneys and experts, for damages sustained by me as a result of this Action or any other matter that may be related to this Action with the understanding that I have preserved my right to pursue these third parties for damages as a result of their negligence. I understand that I may not seek anything further from you for contribution or indemnification as a result of my claims against them. I acknowledge that if such third parties seek indemnification or contribution from you for any damages that I am awarded, I will indemnify and hold you harmless from such damage claims by such third parties and any damages you may sustain as a result of my pursuit of my claims.

When the parties appeared before the trial court to place the terms of their agreement on the record, plaintiff was accompanied by two attorneys: (1) Soranno, who had represented her in connection with the trial of the post-judgment litigation and negotiated the settlement on her behalf, and (2) plaintiff's present counsel, who had been retained to represent plaintiff in a separate malpractice action against her former attorneys and experts. Plaintiff took the stand and was questioned by Soranno about her understanding and acceptance of the terms of this settlement. After Soranno outlined the terms of the settlement to plaintiff, she responded, "There was too much risk for me to continue .... So I settled the best I could." The colloquy continued:

Q. Okay. However, you also understand that as I talked to Mr. Ricker, there are some carve outs in this agreements?

A. Yes.

Q. And did you sign this agreement on the basis that those carve outs exist in the release?

A. Yes.

Q. For example, we talked about one of the carve outs, which was that any obligations that remain in the settlement agreement and supplement to the property settlement agreement or the original property settlement agreement still remain?

A. Yes.

Q. And further that it's our understanding that you hired Ms. Acciavatti to represent you against your former attorneys?

A. Yes.

Q. Okay. And that this settlement agreement and this supplement to the property settlement agreement is specifically carving out, with Mr. Ricker's approval as you've just heard, the opportunity to pursue those parties?

A. Yes.

Q. Are you entering into this settlement and that release on that basis as well?

A. Yes.

Later, Soranno questioned plaintiff with respect to her acceptance of this settlement:

Q. Now, you mentioned that you understood that you could have continued the hearing, but did not because it was, I quote you "too risky to do so."

A. Too—yes.

Q. Okay. But nevertheless, do you believe that this agreement is a reasonable resolution of your claims against Mr. Ricker in this plenary hearing?

A. It is reasonable, but it is not fair and equitable. But it's the best that I could do, and I am satisfied with it.

In response to a question from Ricker's. attorney asking her whether she believed the agreement was fair and reasonable to her, she answered "Yes. I'm signing it. It's the best I could do."

When the trial court would not permit plaintiff's present counsel to make a statement on the record, Soranno made this observation: "I think the only thing that I believe Ms. Acciavatti wanted to place on the record is the importance that this settlement agreement is settling the plenary hearing. But it is contingent upon Ms. Gere's ability to pursue a cause of action against her former counsel or counsels or experts in this matter." That statement produced the following colloquy among Soranno, the trial court, and Ricker's counsel, Mr. DeFino.

THE COURT: Well, I've heard you say that. I've heard Ms. Gere say that in response to your questions.

MR. SORANNO: Fair enough, Judge.

THE COURT: It sounds like it's very clear in the release. I don't know that it needs to be said a third or fourth time.

MR. SORANNO: Understood, Judge.

THE COURT: Mr. Defino.

MR. DEFINO: The only comment I have is the use of one word in Mr. Soranno's last statement. He said this settlement is contingent upon her ability to sue her former counsel. I don't care if she sues her former counsel or—

THE COURT: It's not contingent.

MR. DEFINO: Thank you.

THE COURT: Contingent is a bad choice of words.

MR. DEFINO: Thank you.

THE COURT: I agree. You'll agree, Mr. Soranno, she's not waiving her right to seek redress against any third parties and the release specifically says that she has the ability to do that. But this agreement isn't contingent upon—in other words, if she doesn't have success in any suits that she brings against third parties, I'm sure she doesn't believe that she can come back and reopen this case because she's not satisfied with the outcome of any suits against third parties.

MR. SORANNO: Your Honor, I'll rephrase it this way. As a—this settlement agreement between Ms. Gere and Mr. Ricker was a fully negotiated agreement between the two parties and stand alone.

THE COURT: Correct.

MR. SORANNO: What I believe is merely being put on the record that this agreement, this settlement agreement is not acting to—

THE COURT: Does not preclude her.

MR. SORANNO:—supersede, to preclude, to prevent, to be used as a defense in the future by any future third parties to defend against an action she may ultimately bring against those former attorneys or experts. That's what we wanted to make clear on the record.

That Ms. Gere's understanding is that she has not waived that right. This agreement does not in fact waive that right and it's specifically being carved out. That being said, I agree.

This hearing occurred on July 27, 2007, more than two years after this Court held that a matrimonial litigant who resolves a dispute and testifies that the settlement is an acceptable, fair, and voluntary compromise may not thereafter sue the attorney for the balance not received in that settlement. *Puder, supra,* 183 *N.J.* 428, 874 *A.*2d 534. In November 2007, plaintiff filed a malpractice action against her two former attorneys, Louis and DeBartolo, alleging that each had been negligent and that as a consequence, she received less in the July 2007 settlement than she was entitled to receive under the original property settlement agreement.

Defendants moved for summary judgment, arguing that *Puder* barred plaintiff's action. The trial court agreed. The trial court also held that, in addition to *Puder*'s preclusive effect, plaintiff's claim against Louis was barred because it was not filed within six years of Louis's October 11, 2000, letter. It noted that Louis had agreed to extend the period of limitations to January 2007 and

that it was then equitably tolled until May 2007. Plaintiff's complaint, however, had not been filed until November 2007. Thus, the trial court granted summary judgment to both defendants and dismissed plaintiff's complaint.

Plaintiff appealed to the Appellate Division, and that court affirmed in an unpublished opinion. The panel separately analyzed the claims against Louis and DeBartolo. With respect to Louis, it agreed with the trial court that plaintiff's complaint was time-barred. With respect to DeBartolo, it agreed with the trial court that plaintiff, having voluntarily entered into the July 2007 settlement agreement, which she testified was "fair" and "reasonable," was precluded from seeking damages from him for alleged negligence. We granted certification, limited to the issue of whether *Puder* barred plaintiff's malpractice claim against DeBartolo. 205 *N.J.* 271, 15 *A.*3d 19 (2011). We also granted amicus curiae status to the New Jersey State Bar Association.

## II.

Plaintiff contends that because her claim is factually distinguishable in material respects from the claim asserted in the *Puder* litigation, the trial court and the Appellate Division erred when they applied *Puder* to bar her claim. She maintains that she has not taken contradictory positions as occurred in *Puder*. She stresses that she made an objectively reasonable decision to mitigate her losses when she entered into the July 2007 settlement, and that such an objectively reasonable decision should not be used to preclude her from seeking further relief in a subsequent malpractice action.

Louis asserts that plaintiff in fact waived her interest in the marina in the letter of October 11, 2000. In light of plaintiff's testimony that she intended to retain only her interest in the real estate portion of the marina, and considering the July 2007 settlement that gave her a forty-percent interest in the business operations of the marina, Louis contends that she ended up in a better position than she had originally intended. He argues that

permitting plaintiff to pursue this malpractice action after she told the trial court that she considered the July 2007 settlement to be "fair" would fly in the face of the policies we articulated in *Puder*.

DeBartolo argues that plaintiff made a strategic decision to settle the post-judgment litigation prior to the trial court deciding on the merits of her claim. He joins in Louis's assertion that the terms of the July 2007 settlement were more favorable to plaintiff than the claim she initially asserted under the original property settlement agreement. He also stresses this State's policy of fostering settlements to resolve conclusively litigation.

Amicus New Jersey State Bar Association contends that *Puder* precludes plaintiff's malpractice action against DeBartolo despite the fact that he had no role in the preparation of the original property settlement agreement. It stresses that plaintiff was involved in litigation with respect to her rights under that agreement and then withdrew from that litigation in a settlement she agreed was fair and reasonable. According to amicus, New Jersey's public policy of favoring conclusive settlement of disputes would be furthered by an application of *Puder* to this matter.

### III.

#### A.

We note first the standard governing our review of this matter. Because this appeal arises from the grant of summary judgment, our review of the legal conclusions reached by the trial court and the Appellate Division is de novo. We are not called on to defer to their interpretations of applicable law or the legal consequences that may flow from established facts. *Raspa v. Office of Sheriff,* 191 *N.J.* 323, 334, 924 *A.*2d 435 (2007); *Pheasant Bridge Corp. v. Twp. of Warren,* 169 *N.J.* 282, 293, 777 *A.*2d 334 (2001); *Manalapan Realty v. Twp. Comm.,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995).

### B.

We commence our analysis by noting New Jersey's strong public policy in favor of the settlement of litigation. *Brundage v. Estate of Carambio,* 195 *N.J.* 575, 601, 951 *A.*2d 947 (2008) (stating "[t]he settlement of litigation ranks high in our public policy" (quoting *Jannarone v. W.T. Co.,* 65 *N.J.Super.* 472, 476, 168 *A.*2d 72 (App.Div.), *certif. denied,* 35 *N.J.* 61, 171 *A.*2d 147 (1961))); *Continental Ins. Co. v. Honeywell Intern., Inc.,* 406 *N.J.Super.* 156, 195 n.31, 967 *A.*2d 315 (App.Div.2009) ("New Jersey does have a strong public policy that favors the settlement of disputes."). This policy rests on the recognition that "parties to a dispute are in the best position to determine how to resolve a contested matter in a way which is least disadvantageous to everyone." *Impink ex rel. Baldi v. Reynes,* 396 *N.J.Super.* 553, 563, 935 *A.*2d 808 (App.Div.2007) (quoting *Isetts v. Borough of Roseland,* 364 *N.J.Super.* 247, 254, 835 *A.*2d 330 (App.Div.2003)).

In *Puder,* we noted that "[a]dvancing that public policy [of fostering the settlement of disputed claims] is imperative in the family courts where matrimonial proceedings have increasingly overwhelmed the docket. . . . This practice preserves the right of competent, informed citizens to resolve their own disputes in whatever way may suit them." *Puder, supra,* 183 *N.J.* at 438, 874 *A.*2d 534 (quoting *Lerner v. Laufer,* 359 *N.J.Super.* 201, 217, 819 *A.*2d 471 (App.Div.2003)).

### C.

We deem it necessary to set forth the underlying facts of *Puder* to demonstrate why, in our judgment, this matter is materially distinguishable. In *Puder,* Kathleen Buechel wished to divorce her husband, Frederick Buechel, M.D. *Puder, supra,* 183 *N.J.* at 431, 874 *A.*2d 534. She retained Virginia Puder, Esq., to represent her in that divorce action, and Puder filed a divorce complaint on her behalf. The principal issue to be resolved in terms of negotiating a property settlement agreement was the valuation of certain patents Dr. Buechel, an orthopedic surgeon, had obtained

during the course of the parties' marriage. *Ibid.* The plaintiff asserted the patents had significant value and were largely responsible for the dramatic increase in the couple's income during the marriage while the defendant maintained that their value had peaked and was now on the decline. *Ibid.* Several weeks before the matter was scheduled to proceed to trial, Puder negotiated a settlement that called for her client to receive assets valued at $2 million, alimony of $100,000 per year for five years and child support of $50,000 per year for the Buechels' three children. *Id.* at 431–32, 874 *A.*2d 534. Puder considered this to be a "great deal" for her client and, despite the fact that she had not conducted significant discovery with respect to Dr. Buechel's assets, Puder recommended she accept it. *Ibid.* at 431–32, 874 *A.*2d 534. Mrs. Buechel accepted Puder's recommendation and authorized her to accept this settlement. *Id.* at 432, 874 *A.*2d 534. The attorneys advised the trial court that the matter had been settled and proceeded to reduce the terms of their agreement to writing. *Ibid.*

Prior to completion and execution of a written settlement agreement, Mrs. Buechel consulted with another attorney who expressed the opinion that the agreed-upon terms were "ridiculously inadequate." *Ibid.* Based on that opinion, Mrs. Buechel, after telling Puder that she would not comply with the settlement, discharged Puder and retained new counsel. *Ibid.* Dr. Buechel, in response, moved to enforce the settlement, and the trial court ordered a plenary hearing. *Ibid.*

Before that enforcement hearing commenced, Puder sued Mrs. Buechel for legal fees she alleged were due and owing; in turn, Mrs. Buechel filed a counterclaim alleging that Puder had been negligent in the manner in which she negotiated the property settlement agreement. *Ibid.* The enforcement matter proceeded before the malpractice action, and the trial court heard six days of testimony, at which point Mrs. Buechel's second attorney advised the court that she had agreed to settle her dispute. *Id.* at 433, 874 *A.*2d 534. Mrs. Buechel testified about her understanding and

acceptance of this settlement, which was similar in many respects to the settlement originally negotiated by Puder although it did afford her an additional $100,000 in equitable distribution and an additional $8000 per year in alimony. *Ibid.* Questioned by both the trial court and her attorney, she testified that she was entering the settlement voluntarily, was not pressured to do so, and considered the agreement a fair compromise. *Ibid.* She also testified that it was her understanding that notwithstanding this settlement, she retained her right to pursue the pending malpractice action against Puder. *Id.* at 435, 874 *A.*2d 534. Based on that testimony, the trial court ruled that Mrs. Buechel had "knowingly and voluntarily" entered this second settlement agreement. *Ibid.*

Several months after the conclusion of this second settlement, Puder filed a motion for summary judgment in the malpractice action. *Ibid.* The trial court granted the motion, finding that plaintiff, by agreeing to the second settlement before the validity of the first settlement had been determined, had waived her right to pursue a malpractice action against Puder for her work in connection with that first settlement. *Ibid.*

Mrs. Buechel appealed, and the Appellate Division reversed, concluding that under this Court's decision in *Ziegelheim v. Apollo,* 128 *N.J.* 250, 607 *A.*2d 1298 (1992), "a former client [may] bring a legal malpractice action against an attorney for professional negligence in divorce litigation where a settlement ensued." *Puder v. Buechel,* 362 *N.J.Super.* 479, 485, 828 *A.*2d 957 (App.Div. 2003). This Court thereafter granted Puder's petition for certification, 180 *N.J.* 147, 849 *A.*2d 181 (2004), and reversed the Appellate Division, holding that:

> fairness and the public policy favoring settlements dictate that Mrs. Buechel is bound by her representation to the trial court that the divorce settlement agreement was "acceptable" and "fair." Those statements clearly reflect Mrs. Buechel's satisfaction with the resolution of her divorce, and, therefore, preclude her malpractice claim against her former counsel.
>
> [*Puder, supra,* 183 *N.J.* at 437, 874 *A.*2d 534.]

This Court noted that the trial court had questioned Mrs. Buechel closely and that she had answered that the settlement agreement

was acceptable, that she considered it a fair compromise, and that she was voluntarily agreeing to the settlement. *Id.* at 438, 849 A.2d 181. On the basis of those responses, we concluded:

> Mrs. Buechel bargained for, and received, what she believed was an equitable distribution of the marital estate. Thus, any alleged deficiency resulting from the first settlement was ameliorated by the second settlement that she deemed to be fair and equitable. It would contravene principles of fairness and our policy in favor of encouraging conclusive settlements in matrimonial cases to allow Mrs. Buechel to now pursue her attorney for greater monetary gain. She is bound by her calculated decision to resolve the dissolution of her marriage by accepting her former spouse's settlement offer, a settlement she approved in open court.
>
> [*Id.* at 438–39, 849 A.2d 181.]

This Court disagreed with the view of the appellate panel that Mrs. Buechel's malpractice action could proceed under *Ziegelheim*. *Id.* at 442, 874 A.2d 534. We noted that unlike Mrs. Ziegelheim, "Mrs. Buechel made a calculated decision to accept the second settlement ... *before* the trial court could decide whether the first settlement was enforceable." *Id.* at 442–43, 874 A.2d 534. We also noted that, again unlike Mrs. Ziegelheim, Mrs. Buechel entered the second settlement "admittedly aware of the discovery deficiencies leading up to the first settlement." *Id.* at 443, 874 A.2d 534. In that posture, this Court declined to permit Mrs. Buechel to pursue her claim of legal malpractice.

*Puder*, however, did not erect an absolute bar to a claim of malpractice if a former client enters into a settlement with regard to the underlying action before obtaining a decision with respect to the complained-of conduct of the attorney. That *Puder* did not erect such an insurmountable barrier is demonstrated by this Court's subsequent statement that "*Puder* represent[ed] not a new rule, but an equity-based exception to *Ziegelheim*'s general rule" in which, by "applying equitable principles, [we] carved out a limited exception to the *Ziegelheim* standard." *Guido v. Duane Morris, LLP*, 202 *N.J.* 79, 94, 995 A.2d 844 (2010) (holding that plaintiffs who settled a dispute with respect to their rights in a close corporation were not precluded from suing their former attorneys for advice rendered in connection with that settlement).

See also *Hernandez v. Baugh,* 401 *N.J.Super.* 539, 951 *A.*2d 1095 (App.Div.2008).

### D.

■ Our review of this record convinces us that it contains no basis to warrant applying the "equity-based exception" of *Puder* to the facts of this matter. In *Puder,* we barred the client's malpractice claim because her testimony demonstrated that the second settlement had the effect of placing her in the situation she contended she should have occupied at the outset. That second settlement cured the deficiencies she perceived in the first settlement.

That, however, is not the situation presented to us in this matter. First, plaintiff, unlike Mrs. Buechel, made no claim of malpractice with respect to the negotiation of the original property settlement agreement. Her claim of malpractice against defendant Louis revolved instead around his actions after the original property settlement agreement was executed. Plaintiff claimed that his post-settlement actions jeopardized her rights under the original property settlement agreement.

Plaintiff's claim with respect to defendant DeBartolo is similarly distinguishable from that asserted by Mrs. Buechel in *Puder.* In *Puder,* the settlement agreement that was entered into after six days of testimony essentially placed her in the same position as she had been at the outset. The settlement that plaintiff accepted here, in contrast, did not have that effect. Plaintiff contended that under the original property settlement agreement she had, at the end of the six-month window in October 2000, an interest in all the assets of Navesink Partners. Under the settlement to which she acceded, her interest in Navesink Partners was computed as of January 2007. As a result, she lost nearly six-and-one-half years of participation in the partnership; and in that interim period, the partnership had entered into another venture. Under the July 2007 settlement agreement, she had no claim to that aspect of the partnership's assets.

We are not persuaded by the contention that plaintiff's statement to the trial court in July 2007 that the settlement was "fair" and "reasonable" precludes her from now seeking damages from defendant DeBartolo. The assessment of the settlement's fairness and reasonableness must account for her allegation that DeBartolo's failure to engage in meaningful discovery severely hampered the ability of her successor attorney to establish her claim with respect to Navesink Partners. *Hernandez, supra,* 401 *N.J.Super.* at 542, 951 *A.*2d 1095 (noting that "plaintiff claim[ed] that he was compelled to settle ... because the negligence of defendant deprived him of the proofs he needed to prevail").

Further, we must be mindful of the fact that the matter was decided by way of summary judgment; consequently, we are required to view the record in the light most favorable to plaintiff. *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 536, 666 *A.*2d 146 (1995); *Potomac Aviation, LLC v. Port Auth. of N.Y. and N.J.,* 413 *N.J.Super.* 212, 222, 994 *A.*2d 536 (2010). We are thus compelled to credit plaintiff's assertion with respect to the effect DeBartolo's alleged discovery deficiencies had on her decision to enter the July 2007 settlement rather than to assume the risk of the post-judgment litigation court rejecting her claim in its entirety.

## IV.

The judgment of the Appellate Division is reversed, and the matter is remanded to the trial court for further proceedings.

*For reversal and remandment*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, HOENS, PATTERSON and Judge WEFING (temporarily assigned)—6.