**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3914-23

MICHAEL HATTY and SUSAN
HATTY,

     Plaintiffs-Appellants,

v.

WESTERN INDUSTRIES-NORTH, LLC,
and GLOUCESTER TERMINALS, LLC,

     Defendants-Respondents,

and

WESTERN EXTERMINATING
COMPANY OF PENNSYLVANIA, INC.,
ROLLINS, INC., THE INDUSTRIAL
FUMIGANT COMPANY, LLC, HOLT
LOGISTICS CORP., PRODUCE
SERVICES OF AMERICA, INC., and
GMT REALTY, LLC,

     Defendants.

_____

Argued January 26, 2026 – Decided February 19, 2026

Before Judges Sabatino, Natali and Bergman.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket No. L-1685-19.

V. Paul Bucci, II (Laffey Bucci D'Andrea Reich & Ryan, LLP) of the Pennsylvania bar, admitted pro hac vice, argued the cause for appellants (Samuel I. Reich (Laffey Bucci D'Andrea Reich & Ryan, LLP) and V. Paul Bucci, II, attorneys; Samuel I. Reich and V. Paul Bucci, II, on the briefs).

Robert D. Fox argued the cause for respondent Gloucester Terminals, LLC (Manko, Gold, Katcher & Fox LLP, attorneys; Robert D. Fox, Shoshana (Suzanne Ilene) Schiller, and Danielle N. Bagwell, on the briefs).

Walter F. Kawalec, III, argued the cause for respondent Western Industries-North, LLC (Marshall Dennehey, PC, attorneys; Walter J. Klekotka and Walter F. Kawalec, III, on the briefs).

PER CURIAM

This case involves plaintiff Michael Hatty's long-term workplace exposure to a toxic chemical and issues of medical causation. He and his spouse[1] appeal from a series of trial court orders that ultimately dismissed their claims against the two defendants, Gloucester Terminals, LLC ("Gloucester") and

---

[1] Because the claim of Susan Hatty as a co-plaintiff is for loss of consortium, we generally use the term "plaintiff" in this opinion when it connotes an individual to refer singularly to Michael Hatty, unless the context indicates otherwise. Both plaintiffs should be understood to join in the legal arguments, despite this opinion's usage of the term "plaintiff" in the singular.

A-3914-23

Western Industries-North, LLC ("Western"), on summary judgment and also denied their opportunities to pursue punitive damages.

For the reasons that follow, we reverse summary judgment as to both defendants but affirm the denial of punitive damages. We also affirm the trial court's interpretation of a release that partially limits plaintiff's claims against Gloucester. The case is remanded for a jury trial, subject to certain limitations we set forth in this opinion.

I.

Because this case has not been tried, we describe the pertinent facts subject to the testimony and other evidence that would be actually presented at trial. We consider the pretrial record, as we must, in a light most favorable to plaintiff. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995).

Plaintiff's Initial Work as an Expediter for Del Monte in Delaware Starting in 1998

Plaintiff testified at his deposition that he first started as a seasonal worker in the fruit import industry in 1998 when he worked for the Del Monte

3

company.[2]  The season generally started sometime in winter and lasted until early summer.  Plaintiff had to be rehired each season.

For the first three seasons when he was employed by Del Monte, plaintiff worked at the Wilmington Port terminal in Delaware.  Plaintiff recalled that grapes, pears, and apples came into Wilmington.  Plaintiff knew that the fruit at Wilmington was fumigated overnight before workers came in the morning.

When working for Del Monte, plaintiff's job was known as an "expediter."  His specific duties entailed receiving an order from a truck, going into the refrigerated area—referred to in this litigation as "cold storage facilities" or "cold storage boxes"[3]—and "getting the right fruit" for the order and "putting it on the truck."

### Del Monte Moves Its Operations and Plaintiff's Job to Gloucester Terminal in 2001 or 2002

Around either 2001 or 2002, Del Monte moved its operations to the Gloucester terminal in New Jersey and plaintiff began working there.  The Gloucester terminal has two sections from the central loading dock, Pier 8 and

---

[2]  Del Monte is not a defendant in this case, presumably because of the workers compensation statutory bar to employees suing their employers for negligence.  See N.J.S.A. 34:15-8.

[3]  Some depositions also use the term "cooler."  These terms all appear to refer to the same thing and are used interchangeably throughout the record.

A-3914-23

Pier 9. Pier 8 is known as "Building 14" and Pier 9 is known as "Building 20." Both Pier 8 and Pier 9 have warehouses, each consisting of a large open area where fumigation is performed, referred to as "sheds," and several large, refrigerated cold storage boxes.

When employed by Del Monte in New Jersey, plaintiff worked in "Building 42" at the Gloucester terminal. Plaintiff confirmed that while employed by Del Monte he only worked in Building 42 and never worked in the central warehouses of Pier 8 and Pier 9 at the Gloucester terminal.

Plaintiff explained that his job for Del Monte was the same at the Gloucester terminal as it had been at the Wilmington terminal. Plaintiff further stated he did not receive any additional or new training when he started working at the Gloucester terminal and that he specifically did not receive any training in fumigation.

In the busy season, which ranged from the months of February through April, plaintiff would arrive at the Gloucester terminal around 6:00 a.m. and work until 8:30 p.m. According to plaintiff, the gate to the terminal would not open in the morning "until they had the clearing for fumigation." Plaintiff testified that in Del Monte's busy season, the fruit would be fumigated nearly every night.

A-3914-23

When employed by Del Monte at the Gloucester terminal, plaintiff worked both in the cold storage boxes and in the sheds of Building 42. Plaintiff stated he would have to go into the shed if "your order had a pallet that was not in the refrigerator yet, it had just come off the ship and it was still sitting, you had to go out and get it [from the shed] and find it."

Plaintiff estimated his work involved five percent getting pallets from the shed and ninety-five percent getting them from the cold storage areas to facilitate loading the correct fruit pallets onto the trucks. He further estimated that he would be in the cold storage boxes "for at least 45 minutes to an hour" at a time before coming out for a break, which would only last for about "ten minutes" before another truck came in to be loaded.

<u>Plaintiff's 2003 Achilles Tendon Injury and September 2004 Settlement with Gloucester</u>

In February 2003, while still working for Del Monte at the Gloucester terminal, plaintiff fell on the loading dock while working and tore his Achilles tendon.

A-3914-23

In July 2003, plaintiff and his wife filed a complaint in federal district court against Gloucester, alleging negligence. On September 14, 2004, plaintiff settled the federal case for $80,000 and entered into a release with Gloucester.[4]

Following his Achilles injury, plaintiff returned to work for Del Monte for one additional season. After that, "they didn't rehire" him, signifying that plaintiff's employment for Del Monte ended around 2006.

Plaintiff Returns to Work Around 2007 at the Gloucester Terminal Where Western Was the Fumigator

Around 2007, Produce Services of America ("PSA")[5] hired plaintiff.[6] While employed by PSA, he continued to work at the Gloucester terminal. However, he worked in the Pier 8 and Pier 9 warehouses, which plaintiff refers to as "central," rather than Building 42.

Defendant Western is a firm that provides fruit fumigation services. The fumigation services at the Pier 8 and 9 warehouses were provided by Western.

---

[4] We will discuss the terms and significance of that release in Part II(B), infra.

[5] Plaintiffs named PSA as a co-defendant in this case. However, the trial court dismissed the claims against PSA, and PSA is not participating as a respondent in this appeal.

[6] For sake of clarity in this opinion, we henceforth will use the year 2007 as the approximate year when plaintiff began working for PSA; the actual date may be verified at trial.

A-3914-23

Plaintiff admitted that Western was not involved in providing fumigation services in any of the facilities he worked in while he was employed by Del Monte, including those at the Wilmington terminal, nor in Building 42 at the Gloucester terminal.

The season for PSA began around October or November and lasted until "[a]round the second week of June." The busy portion of the season was from the "middle of January [until] May." During the busy season, plaintiff would arrive at work around 7:30 a.m. and leave around 8:30 p.m.

Plaintiff testified that he served as an expediter when working for PSA and that his job was "basically the same" as it had been at Del Monte. He would get "an order from the truck driver, from the desk, grab the two forklift drivers" and then go into the cold storage boxes to find the correct pallet of fruit to "[make] sure the right fruit was on the order." After this had taken place, "[t]he fork driver took [the pallets] out to the truck [and] put it on the truck." Plaintiff did not handle the fruit himself.

As with his job at Del Monte, when working for PSA, plaintiff was in the cold storage boxes at Pier 8 and Pier 9 for about forty-five minutes to an hour per order. He would similarly only go into the sheds at Pier 8 and Pier 9 about

"five percent of the time" "[i]f the fruit was out in the shed and was needed for the truck."

According to plaintiff, he did not receive any training by PSA nor any information about safety or fumigation. However, he acknowledged seeing and reading a safety warning sign posted on the dock beside the cold storage boxes when he worked for PSA. The jobsite sign used the term "off-gas," which essentially refers to the fruit's emission of gaseous chemicals for a period of time after it has been fumigated.

The sign stated that methyl bromide "can off-gas from the fumigated fruit for several days" and that "[t]he most common effects of overexposure to excessive off-gassing methyl bromide are headache, nausea, vomiting, dizziness, blurred vision, poor coordination, and twitching." It moreover cautioned that workers should "spend only as much time as necessary" in the cold storage boxes "to get your job safely done."

Plaintiff acknowledged that he saw the warning sign on the wall, but did not read it "in that detail." He nevertheless would go into the cold storage boxes "and load[] the truck, [which] took whatever time it took." He said he "knew [methyl bromide] was dangerous" but "thought it was okay" once he and the other workers were given "the okay" to enter the cold storage boxes. Plaintiff

9 A-3914-23

said there were fans and ventilation going on in the cold storage boxes "all the time."

Western's Fumigation Process at Gloucester

Describing the fumigation process at Piers 8 and 9, Timothy McNellis, Gloucester's operations manager of those piers, stated at his deposition that "anything that gets fumigated on" the Gloucester terminal at those piers "gets methyl bromide." He said the methyl bromide itself was administered by Western to the different commodities delivered to Pier 8 and Pier 9. He explained that Western was hired "by the importers to fumigate their fruit," which in this case was PSA, "not by Gloucester Terminal."

Gloucester's manager Peter Inskeep confirmed that Western was the only fumigator for Piers 8 and 9 since he began as Gloucester's operations manager in 2012. The fumigation was done in the sheds of those piers and, according to Inskeep, is regulated by the United States Department of Agriculture ("USDA").

Western's fumigation director Kurt Reichert stated at his deposition that Western "did not have a contract specific with the [Gloucester T]erminal." and that Gloucester did not pay Western.

The fumigation process was elaborated by Western's service supervisor Michael Wisser at his deposition. Wisser explained that "in the warehouse

10

there's a bunch of tarps up in the ceiling" and that those tarps come down to cover the stacks of fruit on the floor of the sheds. A "heat exchanger" is then used to "shoot the gas," referring to methyl bromide, into the tarps to fumigate the fruit.

Wisser testified that fumigation would begin in the evening and last through the overnight hours, usually ending "at the latest, [four] o'clock in the morning." When fumigating the fruit, "all the doors" in the sheds are open.

The fruit venting process was detailed by Western technician Mark Gallo, Jr. at his deposition. Gallo testified that methyl bromide would be put into the stacks of fruit for "three hours" and then "[a]fter three hours, you would vent the fruit for [another] three hours." Once fumigation was complete, a technician would sample the air in the shed to ensure that methyl bromide levels were below 5 parts per million ("ppm") before allowing any workers into that area in the morning.

Gloucester's operations director McNellis confirmed that once Western cleared the sheds, "they'll let security know" and workers were then allowed to enter the terminal, which was "usually before we show up for work." Once fumigated, the fruit was moved to the cold storage boxes.

11

Air Sampling and Testing

At first, air sampling for methyl bromide was only done in the sheds of Pier 8 and Pier 9 where the actual fumigation occurred, not in the cold storage boxes where plaintiff predominantly worked. That changed by 2012 when stricter measures were adopted.

Michael Quigley, Gloucester's then-director of safety and loss control, testified at his deposition that, around 2011, he was tasked "with joining with the Maritime Exchange in developing and responding to the EPA's [the Environmental Protection Agency's] inquiry into how methyl bromide is being handled in the different facilities." Quigley took part in "put[ting] in place a Best Management Practices [("BMP")] for our terminal and do some readings in additional locations of methyl bromide concentrations in the air."

When Quigley joined the task force, he learned "that the fruit after fumigation . . . can still off-gas up to 72 hours." Based on this information, Gloucester decided to start air sampling for methyl bromide in the cold storage boxes of Pier 8 and Pier 9.

The OSHA 20 PPM Permissible Exposure Limit

Quigley stated that the Occupational Safety and Health Administration's ("OSHA's") "permissible exposure limit" for methyl bromide "is 20 parts per

A-3914-23

million." See 29 C.F.R. § 1910.1000(a) (denoted as "Table Z-1").[7] He further explained that Gloucester "set some voluntary lower limits for what would require action on [their] part."

### Adoption of the FASSOP Policy in February 2012 and Mitigation Procedures

When Gloucester first implemented a practice of air sampling for methyl bromide in the cold storage boxes, Western did the sampling. According to Western's fumigation director Reichert, Western did not provide air sampling in cold storage boxes at any other location other than Pier 8 and Pier 9 of the Gloucester terminal. He indicated that Western developed a site-specific policy for monitoring of methyl bromide in the cold storage boxes at those two piers. The policy was referred to "as the Fumigation Air Sampling Standard Operating Procedures, 'FASSOP' for short."

As explained by Reichert, Western developed the FASSOP policy "[i]n conjunction with Gloucester." The written version of FASSOP, dated February 12, 2012, states that "[a]ll air sampling" in the cold storage boxes "needs to be done in the A[.]M[.], prior to anyone entering the coolers" and that "[r]eadings will be recorded on the [s]ampling [l]og [s]heet."[8] The policy directs that "[i]f

---

[7] We discuss the regulation in more detail, infra, at Parts II(C) and (D).

[8] The log sheets have not been included in the record.

readings are above 5ppm [Gloucester] will be notified, and they shall begin their mitigation procedure." "Once the mitigation process has begun, air sampling will resume until 2 sequential readings at 15 minute intervals are below 5ppm." The FASSOP additionally states that "[i]f readings are 10ppm or above [Gloucester] will be notified" and "[a]ccess to area will be stopped and mitigation procedure implemented by [Gloucester]" until "2 sequential readings at 15 minute intervals are below 5ppm."

The Hours of Sampling

Operations Manager McNellis stated that Western would conduct the sampling in the cold storage boxes at Pier 8 and Pier 9 "[b]etween 4:00 and 6:00 a.m." Reichert similarly confirmed that Gloucester had requested that Western conduct sampling in the cold storage boxes for methyl bromide "in the morning" and that Western employees would generally "go in 3:30 or so, 4:00 in the morning to take readings."

Reichert testified that he "believe[d] there were a few occasions in 2016 and, again, in 2017" when Gloucester requested Western to conduct sampling in the cold storage boxes in the afternoon hours. However, he recalled that such afternoon testing was "intermittent."

14

<u>Mitigation When Readings Exceeded 5 ppm</u>

Reichert explained that whoever took the samples in the cold storage boxes from Western would contact McNellis to tell him the reading level. If the level was "above the 5 [ppm, McNellis] would ask that we place fans in the coolers to aerate the coolers." Likewise, Inskeep confirmed that "[i]f we had a reading above 5 [ppm], we would ventilate" and "[i]f there was a reading above 10 [ppm], we would shut down the box."

Reichert further testified that Western "would not initiate anything on [its] own without direction from [Gloucester]." He stated that Western had no control over what Gloucester did regarding any mitigation measures if methyl bromide levels were above the 5 and 10 ppm thresholds in the cold storage boxes. Reichert asserted that, for Western, any methyl bromide reading "under 20 ppm is considered safe" and that the 5 and 10 ppm thresholds were site-specific to Gloucester.

Western's expert industrial hygienist, Bernard D. Silverstein, reviewed the sampling logs for the time that Western was taking the samples in the cold storage boxes in Pier 8 and Pier 9. Silverstein concluded that "none of the sampling data reviewed indicated any exposures above the OSHA standard of 20 ppm[,] which is the exposure limit for workers like [plaintiff]."

15

Gloucester Takes Over the Sampling in 2017

According to Inskeep, around 2017, the tubing used in the cold storage boxes of Piers 8 and 9 to obtain methyl bromide samples needed to be replaced. That led Gloucester employees to take over the responsibility of conducting the methyl bromide sampling in the cold storage boxes in place of Western.

Once Gloucester took over sampling in the cold storage boxes, Inskeep stated it would "take one [sample] prior to the employees going in the boxes in the morning, and then we would take one [sample] in the afternoon."  McNellis confirmed he started taking methyl bromide samples in the cold storage boxes at Pier 8 and Pier 9 beginning in January 2017.  He indicated he "got instructions from USDA and Western Fumigation" on how to conduct the sampling.  He confirmed he would take samples "twice a day" in the cold storage boxes.

Knowledge of Off-Gassing

Most of the Gloucester and Western employees who were deposed understood what off-gassing was with respect to methyl bromide.  For instance, Inskeep stated that "there is information out there that a product can absorb fumigants for longer . . . and that as those products settle, that it can still release residual methyl bromide."  As described by Inskeep, Gloucester was "always

16

concerned, which is why we told employees don't eat the fruit, you have to wash the fruit."

Reichert similarly stated that he understood that "after a commodity is fumigated with methyl bromide, an unknown amount could be absorbed by packaging or the product itself," but stated it would only be a "[v]ery small amount" "[i]n the parts per million level." McNellis comparably stated that he understood that "during the course of the day . . . there is [methyl bromide] gas escaping from some of these boxes" after fumigation and that he knew of this concept before January 2017.

Plaintiff Begins Noticing Symptoms in January 2017[9]

According to plaintiff's testimony, around January 2017, he began experiencing cramping in his right hand. His right hand "would lock" in a "claw-like" position. He stated this cramping would happen "constantly."

In late February to early March 2017, plaintiff also began to experience headaches. He said he had them at home and while at work. He indicated he would get them "two, three times a day, five days a week." Plaintiff

_____

[9] Although plaintiff's medical condition is presumptively private, we refer to his symptoms and diagnoses by necessity given the nature of the issues on appeal. R. 1:38-1A.

A-3914-23

communicated that he "would get dizzy, like off-balance" from the headaches. He believed these headaches were tied to his exposure to methyl bromide.

Other symptoms soon manifested. Around the end of March and into April and May 2017, plaintiff began having nausea and getting lightheaded, which he experienced at home and at work. He recalled the nausea would "last an hour, 40 minutes" and would occur several times per week. He also experienced "burning of the lips every time [he] was in the cooler" which would last for "[a]t least an hour" after he left work. The burning was said to be "constant." However, when he went home, the burning would stop. Plaintiff also experienced dizziness around the same time, as well as back and hip pain.

Plaintiff Consults His Family Doctor in April 2017 and His Blood Test Is Highly Abnormal

Due to these symptoms, in April 2017, plaintiff went to his family physician, Dr. Joseph Mangel, for a blood test. Plaintiff said that "the gossip on the dock" was that workers at the Gloucester terminal were "getting tested for . . . methyl bromide" and that others were getting sick.

When the blood test results came back from the laboratory, Dr. Mangel told plaintiff "that the counts [for methyl bromide] w[ere] six times higher than normal" in his blood. Dr. Mangel referred plaintiff to heart and lung doctors, who he thought should be consulted about the exposure.

 A-3914-23

### Referral to Dr. Katz, a Neurologist

Around that time, Dr. Mangel also referred plaintiff to a neurologist, Olga A. Katz. As recalled by plaintiff, Dr. Katz recommended that he not work for PSA at the Gloucester terminal anymore. Plaintiff accordingly told PSA "the next day" that he would not continue working there, showing his supervisor at PSA his blood test results.

### Plaintiff Stops Working at Gloucester in May 2017, But Some Symptoms Persist

Plaintiff stopped working at the Gloucester terminal in May 2017 and has not worked since.

Some of his symptoms then began to abate. He stated his headaches began to get better "[a]bout six, seven months after [he] was out of work." His nausea began to subside "a good eight months" after he stopped working at the Gloucester terminal. His dizziness ceased that summer after he stopped working.

Plaintiff's function of his right hand, however, continued to be impaired. He testified that Dr. Katz provided electronic treatment for his right hand, but that his right "hand just do[es]n't work" and that his middle three fingers "don't bend" and "don't straighten out." However, plaintiff noted the cramping in his right hand had gotten better since leaving work.

A-3914-23

Beyond physical symptoms, plaintiff described himself as "very, very moody," believing this moodiness to be an effect from methyl bromide exposure. He further explained that he started having memory difficulties around this time, and that he would often "start conversations, and then in the middle . . . just stop them, for some reason" without realizing what he was doing.

Dr. Katz's Neurology Expert Report

In May 2021, Dr. Katz authored an expert report addressing plaintiff's "diagnosis, histories, current impression and prognosis." Her report noted that methyl bromide "is classified as a highly toxic substance" by the United States Centers for Disease Control and Prevention ("CDC") and that it is "a colorless, odorless gas used to fumigate agricultural fields and some produce."

Dr. Katz stated that, according to the EPA, "a respirator is required if the acceptable air concentration level of methyl bromide in the working area, as measured by a direct-reading detector device, exceeds 5 ppm (20 mg/m$^3$)" and that "exposure to toxic levels may occur without warning or detection by the user." Her report noted that, similarly, the National Institute for Occupational Safety and Health ("NIOSH") "recommends as part of its carcinogen policy that the 'most protective' respirators be worn for methyl bromide at any detectable concentration."

20

Dr. Katz's report detailed several studies on methyl bromide exposure. She noted that a 2011 CDC study had "established that two poisoned agricultural workers [who] were exposed intermittently to methyl bromide over several months as part of their job inspecting produce . . . revealed disabling neurologic symptoms (e.g., ataxia, memory difficulties, and dizziness) and elevated serum bromide concentrations serving as proof of exposure." Her report also detailed another CDC investigation from 2015 that reported "three people developed life-threatening illness [two] days after their dwelling was fumigated with the exposure to relatively reduced levels of the residue of methyl bromide confirmed as the causative agent."

Commenting on the difficulties in detecting the substance's toxicity, Dr. Katz's report stated that "[d]ue to its odorless and colorless nature that prevents the potential victim from recognizing the danger, even one-time exposure to methyl bromide may cause severe toxicity." She noted that was the case in "another 2015 report on an accidental one-time exposure that caused multi-organ failure and the victim to spend two months in intensive care."

According to Dr. Katz's expert report, "the use of methyl bromide is associated with numerous cases of acute and chronic toxicity to human beings and is two-fold." At first, "methyl bromide is toxic, primarily to central and

A-3914-23

peripheral nervous system[s] due to its affinity to neuronal DNA." But then, "as the compound enters into chemical reactions with biological substances, toxicity of its constituent components, the methyl group and the bromide (bromide ion) is combined via . . . susceptible biologic compounds such as DNA and proteins, and the direct toxicity of the bromide (bromide ion) that is especially pronounced in the peripheral and autonomic nervous system."

Dr. Katz explained that "[d]epending on the specific vulnerabilities of the victim, methyl bromide toxicity may present with a wide spectrum of central and peripheral neurologic symptomology, from ataxia, memory deficits, and visual disturbances, to autonomic neuropathy involving cardiac nerves and peripheral neuropathy of one or more extremities."

Further, Dr. Katz underscored that the "initial measurement of bromide levels" in plaintiff's blood in April 2017 "was extremely high at 7.2 mg/dL" with the toxicity level being 1.2 mg/dL. She noted that even after plaintiff had been "avoiding the exposure, the levels of bromide remained elevated above the toxic level" in a later blood test in late May 2017. She added that cases reported by the CDC indicate that "life-threatening exposure was associated with bromide levels less than 10 mg/dL, similar to the levels measured in [plaintiff's] first laboratory workup."

In sum, Dr. Katz opined that plaintiff's "acute symptoms were concordant with methyl bromide poisoning, such as paresthesia (abnormal sensation) in the face and lips due to acute toxicity in the sensory nerves, and frequent episodic headaches associated with . . . paresthesia of the lower back and muscle weakness of the lower extremities." She stated these symptoms "further developed with muscle weakness of the right thumb and the third and fourth fingers to the point of involuntary flexion."

Dr. Katz further opined that "[b]oth the development of symptoms and the improvement after leaving the contaminated area are fully consistent with acute poisoning with methyl bromide as described in the literature." (Emphasis added). She also noted that plaintiff had "[o]bjective muscle strength and bulk changes" [that] "have been noted by several specialists," mainly in his right arm, hand and fingers.

Dr. Katz concluded that (1) "[i]n [plaintiff's] case the long-term chronic exposure to the chemical officially classified as highly toxic le[]d to the development of slowly progressive long-term degenerative processes in the peripheral nervous system manifesting as multifocal motor neuropathy of the upper right extremity" and (2) there was a "confirmed loss of muscle bulk, severe muscle weakness and inability [by plaintiff] to perform [the] simplest

23

tasks such as closing fist and touching other fingers with thumb" in his right hand.

Dr. Katz opined "[w]ithin [a] reasonable degree of medical certainty that [plaintiff] is totally and permanently disabled for gainful employment as a direct result of the exposure to the highly toxic chemical, methyl bromide." (Emphasis added).

Dr. Laumbach's Occupational and Environmental Medicine Expert Report

In July 2022, Dr. Robert L. Laumbach issued an expert report. He is a diplomate of the American Board of Preventive Medicine (Occupational Medicine), the American Board of Family Medicine, the American Board of Industrial Hygiene, and the American Board of Toxicology. He has over twenty-five years of experience in the "analysis of the adverse health effects of occupational and environmental agents, including chemical, physical, and biological agents." Moreover, Dr. Laumbach is an M.D. and specializes in Occupational and Environmental Medicine. He also has a Master's degree in Public Health.

Dr. Laumbach was retained to address "whether or not [plaintiff] sustained personal injuries due to exposure to methyl bromide . . . while employed at

[PSA] as an expediter from about 2007 to 2017, and as a loader/expediter for Del Monte from about 1998 to about 2007."

Dr. Laumbach's report reflects he interviewed and examined plaintiff on February 11, 2022. He also considered a report from industrial hygienist Dr. Richard M. Lynch (which we describe, infra), the depositions of plaintiff and various employees from Gloucester and Western, and numerous medical records.

From his physical examination of plaintiff, Dr. Laumbach found that he had "[s]evere muscle wasting apparent in the right hand," right forearm, and to a slight extent in his upper right arm. Plaintiff's grip was also significantly weaker in his right hand compared to his left. Dr. Laumbach also noted that plaintiff had reduced strength in his right hip.

Addressing the question of general causation, Dr. Laumbach's report noted that methyl bromide is classified as a "[r]estricted [u]se [p]esticide" by the EPA and that it is "a very toxic fumigant gas that has caused severe poisonings and death." He stated that "[i]n case of overexposure to methyl bromide, reports of neurological toxicity are common and associated with characteristic findings on MRI of the brain consistent with central nervous system ("CNS") toxicity, as well as peripheral neuropathy." His report detailed

25

that exposure to methyl bromide "can cause gastrointestinal, neurological, and respiratory injury" as well as "[h]eadaches, loss of appetite, nausea, vomiting, visual disturbances, and fatigue and weakness," which "have been commonly reported after short-term exposure to methyl bromide."

According to Dr. Laumbach, "[l]onger-term exposure is associated mainly with neurological signs and symptoms in humans." Such exposure "has been associated with a variety of central and peripheral nervous system disorders including mental confusion, lethargy, loss of initiative, depressed libido, personality changes, apathy, amnesia, aphasia, blurred vision, dysarthria, polyneuropathy, and muscle weakness."

Dr. Laumbach stated that plaintiff's "neuropathy can be described as a motor neuron neuropathy, mostly upper extremity, and mostly unilateral in the right arm" and that plaintiff additionally exhibited "right lower extremity weakness." He cited to several studies that have "noted that cases of acute and chronic exposure [to methyl bromide] have included muscle weakness and pain" as well as "upper and lower extremity weakness." He also noted that "[f]ew studies have examined the effects of long-term exposure to methyl bromide on exposed workers."

26

Regarding specific causation, Dr. Laumbach found in his report that plaintiff's "weakness, muscle wasting, cramping, and pain in the right forearm and hand are typical of a motor neuron neuropathy" and that plaintiff "also had symptoms of acute central nervous system toxicity." He noted plaintiff "had an elevated bromide level in his blood . . . which documented substantial exposure." Notably, "[a]fter [plaintiff] stopped working on the dock, his blood bromide levels slowly declined as expected, to normal levels."

Dr. Laumbach found that the return to normal levels of bromide was "consistent with cessation of exposure to methyl bromide after he stopped working at the terminal in May of 2017." He also indicated that "occupational exposure to methyl bromide has been associated with a variety of CNS and peripheral nerve toxicities in exposed workers," and that "[t]he clinical presentation of these exposed workers with methyl bromide poisoning have included the signs and symptoms of [plaintiff's] disease."

Further, Dr. Laumbach determined that "[t]he elevated bromide level, documenting substantial exposure to methyl bromide, and consistency and specificity of [plaintiff's] clinical presentation with reported cases . . . provide strong support for a causal association between occupational exposure to methyl

bromide and [plaintiff's] peripheral neuropathy and central nervous system symptoms." (Emphasis added).

Additionally, Dr. Laumbach found plaintiff's "acute symptoms" to be "consistent with overexposure to methyl bromide" and that it was likewise "highly likely that he had chronic overexposure to methyl bromide given the conditions under which he worked." (Emphasis added).

In sum, Dr. Laumbach ultimately concluded that "[t]o a reasonable degree of medical probability, all of [plaintiff's] peripheral and central nervous system pathologies with onset at the time of, and in the several years preceding, the discover[y] of his poisoning with methyl bromide, were caused by his occupational exposure to methyl bromide while working as an expediter for PSA and Del Monte." (Emphasis added).

Dr. Lynch's Industrial Hygienist Expert Report

In July 2022, plaintiff served an expert report from a third expert, Dr. Lynch, who, while not a medical doctor, has a Ph.D. in public health and an M.S. in industrial hygiene. Dr. Lynch visited the Gloucester terminal in June 2021, and inspected the cold storage boxes at Pier 8 and Pier 9.

Dr. Lynch's report expressed his opinion that plaintiff "was chronically exposed to significant airborne levels of methyl bromide during his work tenure

28

as [an] expediter at [Gloucester] over the course of his employment between 2006 and 2017."

Dr. Lynch's report detailed that the New Jersey Department of Health ("DOH") categorizes methyl bromide as a toxic substance and that it should be "handle[d] . . . as a possible carcinogen." He noted that a DOH fact sheet from 2006 cautioned that "[r]epeated exposure may cause damage to the brain and nervous system."

Along similar lines, Dr. Lynch's report also noted that the 2011 Material Safety Data Sheet for methyl bromide indicated that "[l]ong term exposure may cause peripheral nervous system disorders [and] central nervous system disorders."

Dr. Lynch opined that any methyl bromide measurements from Western in the cold storage boxes of Pier 8 and Pier 9 were "likely underestimates of methyl bromide levels chronically experienced by [plaintiff] during the approximate 11-year period." He stated plaintiff "was routinely exposed to chronic airborne levels of methyl bromide at levels exceeding the American Conference of Governmental Industrial Hygienists['] 8 hour threshold limit value of 1 [ppm], as well as the Gloucester [t]erminal [BMT] guideline of 5 [ppm]." (Emphasis added).

A-3914-23

As to these measurements, Dr. Lynch opined "within a reasonable degree of scientific certainty that <u>airborne methyl bromide levels routinely exceeded 5 ppm to as high as 10 ppm</u>" in the cold storage boxes, since methyl bromide likely "<u>continued to off-gas throughout the workday</u>." (Emphasis added). Dr. Lynch estimated that plaintiff's exposure "during the approximate 11 years of his employment at Gloucester terminal <u>conservatively ranged between 2 to 20 [ppm] for several hours of each typical workday within the cold box</u>." (Emphasis added).

Criticizing defendants' practice, Dr. Lynch stated that Gloucester and Western knew that methyl bromide could off-gas and that they "<u>failed to exercise reasonable care to ensure that the off-gassing of methyl bromide did not harm the workers</u>." (Emphasis added). He also noted that Gloucester and Western failed to follow their own FASSOP and BMP internal policies "to ensure that workers . . . were not unreasonabl[y] exposed to excessive and unsafe levels of methyl bromide."

<u>Defendants' Expert Reports</u>

Although we are obligated to review the summary judgment record and expert reports in a light most favorable to plaintiff, we briefly describe the competing expert reports tendered by defendants below.

30

Dr. Thomas Lewandowski

Dr. Lewandowski has a Ph.D., in Environmental Health (Toxicology), a Master's degree in Public Health, and has been the principal of an expert consulting firm since 2001. His areas of expertise listed on his curriculum vitae include product safety, risk assessment, chemical metabolism and disposition, dermal toxicology, reproductive and developmental toxicology, and metals technology. He issued an expert report for the defense in December 2022.

Based on his own analysis of the record, Dr. Lewandowski concluded, to a reasonable degree of scientific certainty, "[t]here is no indication that during the course of his employment at the Gloucester Terminal facility, [plaintiff] was ever exposed to [methyl bromide] at concentrations above the OSHA permissible exposure limit . . . of 20 ppm." (Emphasis added). He added that "[a]ir monitoring data show[s] that any exposure was minimal and well below the 20 ppm value." Dr. Lewandowski further opined that plaintiff's "claimed long-term health effects . . . are not consistent with [methyl bromide] exposure based on the available scientific evidence and are unlikely to have been caused by [methyl bromide] exposure." (Emphasis added).

Dr. Lewandowski critiqued the analyses of two of plaintiff's three experts. Among other things, he asserted that Dr. Laumbach relied on studies of

31

incomparable "very high [methyl bromide] concentrations." He contended that Dr. Katz's report citation of literature in the field is "limited" and "disregards the important concept of dose."

In summary, Dr. Lewandowski concluded "there is <u>no evidence that [plaintiff] was ever exposed to [methyl bromide] levels above the OSHA [permissible exposure level], or at a level sufficient to cause significant, chronic injury</u>." (Emphasis added).

Bernard Silverstein

Defense expert Bernard Silverstein, who we have mentioned, <u>supra</u>, has a Master's degree in Environmental and Occupational Health Sciences, with a concentration in Industrial Hygiene. Since he is not a medical doctor, Silverstein did not address the question of medical causation. He issued a report for defendants in this case in September 2022. He evaluated documents and data for the time period from 2008-2017. His opinions were likewise issued to a reasonable degree of scientific certainty.

Silverstein does not dispute the potential toxic effects of methyl bromide exposure. He relied heavily on the 20 ppm ceiling limit set by OSHA to conclude that there is no evidence to support the plaintiff's claims.

He contends that plaintiff's expert Dr. Lynch relied on a misinterpretation of the 5 ppm exposure limit, and, because there is no evidence that plaintiff was ever exposed to levels above the 20 ppm ceiling established by OSHA, the safety protocols in place were sufficient to protect the health of the employees.

Summary Judgment Practice

Gloucester moved for summary judgment seeking dismissal of plaintiff's negligence claim, based largely on arguments about the preclusive effect of the September 2004 general release. The trial court heard oral argument on the motion on June 23, 2023, and issued an oral ruling that same day.

Based on what the court characterized as the "very conventional" language of the general release between plaintiff and Gloucester, the court found that "plaintiff can make a claim presumably for exposure to toxic chemicals but only in regard to the exposure that occurred after the September of 2004 date in the release."

Regarding causation, the court stated that plaintiff "need[ed] an expert to say that the post September 2004 exposure in and of itself . . . to a reasonable degree of medical probability . . . was enough to probably cause" plaintiff's injuries. (Emphasis added). "[A]bsent that," the court did not "think you get to the jury and [get to] ask the jury [to] speculate that whatever exposure the

plaintiff had to those chemicals after September 20[0]4 <u>in and of itself was</u> <u>sufficient</u> to cause their problems."  (Emphasis added).

The court reviewed the reports of Drs. Lynch and Laumbach, but did not "see anything that basically said that [post-2004 exposure to methyl bromide] alone could have caused" plaintiff's injuries.  Acknowledging that Gloucester did not have Western begin air sampling for methyl bromide in the cold storage boxes until around 2011 or 2012, the court did not "read from what [plaintiff] just provided . . . anything that says that . . . exposures during the hard number periods," referring to 2011 and beyond when air sampling was conducted in the cold storage boxes, "<u>alone</u> can cause the problems."  (Emphasis added).  The court added that "any exposure after 20[0]4 was inconsequential because the damage is already done."

Since the court deemed plaintiff to bear the burden to prove causation, the court concluded "that gap in knowledge concerning hard numbers [of methyl bromide levels in the cold storage boxes] that predated 2012, the consequences of that gap, are not going to be visited upon Gloucester Terminals."  Because plaintiff could not "prove whether or not it was the exposure that predated 2004 as opposed to the exposure that postdated 2004" that caused his injuries, the

34

court granted Gloucester's motion for summary judgment as to plaintiff's negligence claim and entered an order to that effect on June 23, 2023.

Plaintiff moved for reconsideration of the order granting summary judgment to Gloucester. Meanwhile, Western filed its own motion for summary judgment on plaintiff's negligence claim on a similar basis as Gloucester had regarding causation, namely that plaintiff's experts were unable to opine that his methyl bromide exposure while working exclusively for PSA from 2007 onwards was the cause of plaintiff's injuries.

The trial court held oral argument on both motions on September 8, 2023. The court observed that if it denied the motion for reconsideration granting summary judgment to Gloucester, it "almost certainly [would be] granting the motion for summary judgment" in favor of Western "because . . . they contain either identical or substantially similar arguments."

The court denied the motion for reconsideration because "none of the plaintiff's experts even attempted to indicate that exposure post-release was a substantial factor" in causing plaintiff's injuries, and plaintiff therefore could not meet the standard for proximate causation to satisfy their negligence claim.

That same day, September 8, 2023, the court entered an order denying plaintiff's motion to reconsider the grant of summary judgment to Gloucester.

The court similarly granted Western's motion for summary judgment largely for the same reasons. The court entered an order dismissing all claims against Western on September 11, 2023.

Punitive Damages Rulings

Apart from these liability issues, each defendant also moved for dismissal of plaintiff's claims for punitive damages under N.J.S.A. 2A:15-5.9 to -5.17, in the hypothetical event that liability was established. Western filed its motion first, styled as a motion for partial summary judgment.

On July 6, 2023, the court orally granted Western's motion. For reasons we will explore, infra, in Part II(D), the court concluded that plaintiff could not show, by clear and convincing proof, that Western had a "wanton and willful disregard" of plaintiff's health stemming from his workplace exposure to methyl bromide. Although the court acknowledged that Western did not begin sampling for methyl bromide in the cold storage boxes until 2012, the court did not regard Western's conduct to qualify as "especially egregious" to warrant punitive damages. The court issued a written order on the same day memorializing that determination.

Gloucester similarly moved for partial summary judgment dismissing the punitive damages claims against it. By the time the court considered that

motion, it had already granted Gloucester summary judgment on liability as to plaintiff's underlying negligence claims. Consequently, the court deemed Gloucester's punitive damages dismissal motion moot, issuing an order to that effect on July 21, 2023.

This appeal by plaintiff followed.

## II.

On appeal, plaintiff argues the trial court erred in granting summary judgment to both defendants. Fundamentally, he contends that the court failed to apply New Jersey's more lenient standards for proving medical causation in a toxic-tort workplace exposure case. Plaintiff further argues the court improperly found deficient the opinions of his experts in not explicitly segregating the harm to plaintiff from his exposure to methyl bromide at the Delaware terminal while he worked there previously for Del Monte.

Plaintiff similarly asserts that the court erred in faulting his experts for not segregating the exposures that occurred, respectively, before his September 2004 release with Gloucester and, as to Western, the exposures that occurred before Western began fumigating at the Gloucester Terminal in or about 2007.

Additionally, plaintiff argues the trial court erred as a matter of law in too broadly construing the 2004 general release. Lastly, he argues that the court should have preserved his claims for punitive damages against both defendants.

A.

We address plaintiff's' arguments utilizing familiar standards of summary judgment and appellate review. Appellate courts review a grant of summary judgment de novo, applying the same standard as the motion judge. Samolyk v. Berthe, 251 N.J. 73, 78 (2022). That standard requires a determination be made as to "whether 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021) (quoting R. 4:46-2(c)).

"To decide whether a genuine issue of material fact exists, the trial court must 'draw[] all legitimate inferences from the facts in favor of the non-moving party.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (alteration in original) (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 480 (2016)). "An issue of fact is genuine only if . . . the evidence submitted by the parties on the motion, together with all legitimate interferences therefrom favoring the non-moving

38

party, would require submission of the issue to the trier of fact." R. 4:46-2(c). By comparison, "[t]o the extent that the grant or denial of summary judgment is based on an issue of law, [appellate courts] owe no deference to an interpretation of law that flows from established facts." State v. Perini Corp., 221 N.J. 412, 425 (2015) (citing Town of Kearney v. Brandt, 214 N.J. 76, 92 (2013)).

B.

As a threshold issue that only concerns defendant Gloucester, we address the trial court's interpretation of the September 14, 2004 general release that plaintiff provided to Gloucester when he settled his federal case arising from his workplace Achilles heel injury.

The release stated, in pertinent part, as follows:

> [Plaintiff] release[s] any and all rights which [Plaintiff] may have against [Gloucester]. This releases all claims, including those of which [plaintiff is] not aware and those not identified in this [r]elease. This [r]elease applies to claims resulting from anything which has occurred to date. [Plaintiff] specifically release[s] the following claims:
>
> a. Any and all past, present or future claims . . . of any nature whatsoever based upon a tort, contract or other theory of recovery and whether for compensation or punitive damages [plaintiff] now ha[s], or which may hereafter accrue or otherwise be acquired, against [Gloucester] either directly or indirectly, including by way of example and not limitation, those which may or could have been the subject matter of [the] lawsuit

A-3914-23

instituted in the United States District Court for the District of New Jersey, Civil Action No.: 03-3530.

b. This [r]elease is for compensation of any and all injuries [plaintiff] sustained, known, unknown or unknowable. . . . It is expressly understood that this [r]elease is for the settlement, release, discharge and elimination of any and all claims. [Plaintiff] hereby acknowledge[s] that by executing this [r]elease and accepting the monies paid hereunder, [plaintiff] and those who otherwise might be entitled to make such a claim or claims in the future have received fair, just and adequate compensation for all such claims in exchange for which all such claims, past, present and future are forever released and discharged. . . . Even if additional facts become known which were not known at this time this [r]elease was executed, [plaintiff] waive[s] [his] right to bring a lawsuit against [Gloucester].

Plaintiff argues the release does not limit his claims against Gloucester to any extent because this case is about his workplace exposure to methyl bromide and has nothing to do with his Achilles heel injury. The trial court appropriately rejected that no-limitation argument.

A general release is "merely a form of contract and the general rules that apply to contract interpretation apply to releases." Domanske v. Rapid-Am. Corp., 330 N.J. Super. 241, 246 (App. Div. 2000). The interpretation of the release is therefore subject to de novo review by an appellate court, which will "pay no special deference to the trial court's interpretation and look at the contract with fresh eyes." Kieffer v. Best Buy, 205 N.J. 213, 223 (2011).

Certain well-established principles apply to this issue. "A basic principle of contract interpretation is to read the document as a whole in a fair and common sense manner." Hardy ex rel. Dowdell v. Abdul-Matin, 198 N.J. 95, 103 (2009). "If the terms of a contract are clear, they are to be enforced as written." Malick v. Seaview Lincoln Mercury, 398 N.J. Super. 182, 187 (App. Div. 2008). Likewise, "[t]he scope of a release is determined by the intention of the parties as expressed in the terms of the particular instrument, considered in the light of all the facts and circumstances." Bilotti v. Accurate Forming Corp., 39 N.J. 184, 203-04 (1963).

"A general release, not restricted by its terms to particular claims or demands, ordinarily covers all claims and demands due at the time of its execution and within the contemplation of the parties." Id. at 204. When a release's language refers to "any and all" claims, courts generally do not permit exceptions. Isetts v. Borough of Roseland, 364 N.J. Super. 247, 255-56 (App. Div. 2003).

Plaintiff argues the trial court erred in "barr[ing]" him "from asserting an occupational-exposure, toxic tort claim not known until May of 2017." But the trial court did not find that the release barred plaintiff from asserting his current claim in its entirety. The court instead found that the general release precluded

plaintiff from bringing his claim against Gloucester in relation to any methyl bromide exposure that occurred before the September 14, 2004 release. That interpretation of the release was sound.

The plain language of the release refutes plaintiff's argument. Malick, 398 N.J. Super. at 187. The release, which plaintiff entered into with the advice of counsel, states that it applies to claims "resulting from anything which has occurred to date," and specifies that would include "[a]ny and all past, present or future claims . . . of any nature whatsoever" "known, unknown or unknowable." It similarly states that "[e]ven if additional facts become known which were not known at this time this [r]elease was executed," plaintiff still "waive[s] [his] right to bring a lawsuit against" Gloucester.

It is therefore clear from the plain language of the release, as the trial court found, that the "intention of the parties" was that plaintiff released all claims against Gloucester of any kind that occurred up to September 14, 2004–whether related or unrelated to his Achilles injury and whether plaintiff knew about them or not–which would include his current claims for pre-September 2004 toxic exposure to methyl bromide. Bilotti, 39 N.J. at 203. The release does not "restrict[] by its terms" that it only applies to "particular claims or demands"

42

arising from the Achilles injury, and it therefore "covers all claims and demands due at the time of its execution. . ." Id. at 204.

Plaintiff relies on Isetts, 364 N.J. Super. at 251-55, for his assertion that he only released claims related to his Achilles injury. In Isetts, the plaintiff first filed suit against his employer in January 2000 alleging he was subject to harassment and retaliation. 364 N.J. Super. at 250. The case was settled in 2001, and the plaintiff signed a general release releasing his employer from "all claims resulting from anything that has happened up to the date of its execution" including all claims "that were asserted or could have been asserted." Id. at 251.

After the execution of the release, the plaintiff in Isetts was subject to new incidents of harassment and retaliation and subsequently filed a second suit. Ibid. The court explained that the plaintiff "acknowledge[d] that all claims existing at the time of the settlement ha[d] been extinguished by way of the release." Id. at 254. The court also recognized that the phrase "any and all claims, rights, actions and causes of action of any kind" in the general release "allows for no exception" and that the plaintiff had "surrendered 'any and all' of his existing 'claims, rights, actions and causes of action.'" Id. at 255-56. The only question in Isetts was whether that language would similarly bar the plaintiff from the right to seek discovery in the later unreleased action. Id. at

256. Hence, Isetts is distinguishable as a case about discovery, not about the disposition of the legal effect of a general release.

We therefore affirm the court's ruling concerning the release in the present case. Plaintiff's' claims against Gloucester are limited to recovery for harms caused by methyl bromide exposure after September 14, 2004.[10]

### C.

We turn to the central issues of medical causation affecting both defendants, which are at the heart of this appeal. We preface that discussion with some important background about New Jersey's distinctive approach to medical causation questions in toxic-tort and occupational exposure cases.

New Jersey's "Substantial Factor" Test of Causation for Toxic-Tort Cases

Generally speaking, to establish a claim for negligence, a plaintiff must prove (1) a duty of care; (2) a breach of that duty; (3) proximate causation; and (4) injury. Stevens v. N.J. Transit Rail Operations, 356 N.J. Super. 311, 318-19 (App. Div. 2003). The third element—causation—is pivotal to the liability issues on this appeal.

---

[10]  We discuss, infra at Part II(C), the burdens of proof associated with that temporal limitation.

Our courts have prescribed special rules for establishing causation in toxic tort lawsuits in this state. "[T]he modern trend has been to relax or broaden the standard for determining medical causation in toxic-tort litigation." James v. Chevron U.S.A., Inc., 301 N.J. Super. 512, 530 (App. Div. 1997). This is because "[i]n the toxic-tort context, 'proof that a defendant's conduct caused [a plaintiff's] injuries is more subtle and sophisticated than proof in cases concerned with more traditional torts.'" Id. at 531 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 413 (1992)).

As our Supreme Court has instructed, "[i]n a toxic tort action," including in cases such as this involving occupational exposure to toxic materials, "a plaintiff must prove what is known as 'medical causation'—that the plaintiff's injuries were proximately caused by exposure to the defendant's product." James v. Bessemer Processing Co., Inc., 155 N.J. 279, 299 (1998).

"To prove medical causation, a plaintiff must show 'that the exposure [from the defendant's product] was a substantial factor in causing or exacerbating the disease.'" Ibid. (quoting Sholtis v. Am. Cyanamid Co., 238 N.J. Super. 8, 30-31 (App. Div. 1989)) (emphasis added).

Conduct is a "substantial factor" if it would:

> [L]ead the trier of fact, as a reasonable person, to regard it as a cause, using that word in the popular sense.

A-3914-23

> Under the "substantial factor" test, the defendant's negligence need not be the sole or primary factor producing the injury; it need only be a substantial factor. Thus the test covers the situation where there may be several substantial factors contributing to the same result.
>
> [Verdicchio v. Ricca, 179 N.J. 1, 24-25 (2004) (quoting J.D. Lee & Barry A. Lindahl, Modern Tort Law: Liability & Litigation § 4.03, 4-4 (West Group 2002)) (emphasis added).]

That said, "merely establishing that a defendant's negligent conduct had some effect in producing the harm does not automatically satisfy the burden of proving it was a substantial factor . . ." Id. at 25 (emphasis added). As the Court elaborated in Verdicchio:

> Some other event which is a contributing factor in producing the harm may have such a predominant effect in bringing it about as to make the effect of the actor's negligence insignificant and, therefore, to prevent it from being a substantial factor. So too, although no one of the contributing factors may have such a predominant effect, their combined effect may, as it were, so dilute the effects of the actor's negligence as to prevent it from being a substantial factor.
>
> [Ibid. (quoting Restatement (Second) of Torts § 433 cmt. d (Am. L. Inst. 1965)).]

Hence, "a defendant's deviation need not be the only cause, nor primary cause, for the deviation to be a substantial factor in producing the ultimate result" but "defendant's negligent conduct cannot be a remote or inconsequential

contributing factor." Id. at 30 (emphasis added). "It must play a role that is both relevant and significant in bringing about the ultimate injury." Ibid.

This approach is consistent with the instructions to Model Jury Charges (Civil), 6.12, "Proximate Cause — Where There Is Claim That Concurrent Causes Of Harm Were Present" (Nov. 2023), which advises:

> In toxic tort (i.e. asbestos exposure) cases where the plaintiff has presented competent and credible evidence that even a minimal exposure to the substance can cause the claimed injury or disease, it may be appropriate for the court to instruct the jury that a substantial factor is an 'efficient cause' of the claimed injury or disease and not a remote or trivial cause having only an insignificant connection with the harm, but that liability should not attach based on casual or minimal contact with the product or imposed based on mere guesswork.

See also Fowler v. Akzo Nobel Chemicals, Inc., 251 N.J. 300 (2022).

Frequency, Regularity and Proximity

In Sholtis, a case involving the plaintiffs' exposure over a long period of time to multiple asbestos products manufactured by multiple defendants, we held that:

> If the evidence establishes that reasonable jurors could infer that sometime during their work histories . . . plaintiffs were exposed to a defendant's friable asbestos frequently and on a regular basis, while they were in close proximity to it (balancing these factors); and if competent evidence, usually supplied by expert proof, establishes a nexus between the exposure and plaintiff's

47

condition, then that defendant's summary judgment motion must be denied.

[238 N.J. Super. at 31 (emphasis added).]

We noted in Sholtis this test "appears to us to be well-reasoned, properly focusing upon the cumulative effects of the exposure" and that "[i]t is a fair balance between the needs of plaintiffs (recognizing the difficulty of proving contact) and defendants (protecting against liability predicated on guesswork)." Id. at 29.

As to the allocation of liability in such matters, we further explained in Sholtis that, if a fact-finder found that one or all of the defendants were at fault, "any proof allowing a reduction from joint and several responsibility would come from these defendants' (not plaintiffs') urging that their respective shares should be reduced under the principles of comparative negligence." Id. at 30. In that sense, "[d]efendants would merely be joint tortfeasors, seeking . . . to reduce their culpability based upon . . . a smaller share of plaintiffs' total exposure." Ibid.

Our Supreme Court has rejected the notion that the Sholtis test should only be used in cases involving asbestos exposure. It held in James that the Sholtis test could be used generally in occupational exposure, toxic-tort cases to establish medical causation. James, 155 N.J. at 304. The Court "stress[ed]" that

48

"[t]he 'frequency, regularity and proximity' test [of medical causation] assigns liability only to those defendants to whose products the plaintiff can demonstrate he or she was intensely exposed," and "bears no relationship to theories of collective liability that some courts have adopted in contexts where the specific tortfeasor or tortfeasors that caused plaintiff's injury cannot be identified." Id. at 302.

More recently, the Court has made clear that "the Sholtis test is adaptable to varying scenarios and should not be rigidly and inflexibly applied." Fowler v. Akzo Nobel Chems., Inc., 251 N.J. 300, 334 (2022). "The frequency, regularity, and proximity test is merely an articulation of what constitutes a substantial factor for purposes of determining proximate cause in an occupational exposure setting." Id. at 336.

Applying the Causation Tests to this Case

As we noted above, in granting summary judgment to Gloucester on plaintiff's post-release negligence claims, the trial court found that plaintiffs had failed to sustain what the court perceived as their burden to show that the exposure from the post-2004 time period "alone" caused damage. The court also criticized plaintiffs for being unable to "prove whether or not it was the exposure

that <u>predated</u> 2004 <u>as opposed to</u> the exposure that <u>postdated</u> 2004." (Emphasis added).

Having framed the test in this "either-or" manner, the trial court did not sufficiently appreciate whether genuine issues of material fact existed concerning whether plaintiff's post-release exposure at Gloucester could at least be a "substantial factor" in causing his symptoms. In fact, the court made its own pre-emptive determination that the damage had "already [been] done." The court did not make any findings about the frequency, regularity, and proximity of plaintiff's post-September 2004 exposure at Gloucester.

Later, in granting summary judgment to Western, the court used different terminology in its oral opinion but reached the same conclusion. This time, the court found that plaintiff's "experts have not indicated at all that exposure . . . to the time period where [Western] will be responsible for the methyl bromide was <u>a substantial factor</u>" in causing plaintiff's injuries, resulting in the court "granting their motion" for summary judgment also. (Emphasis added). However, despite using that terminology, the court did not explain why that exposure for a decade (from about 2007 when plaintiff began working at the terminal where Western performed fumigation to plaintiff's resignation in 2017)

was merely insubstantial.  Nor did the court address as to Western the frequency, regularity, and proximity factors as prescribed by case law.

The trial court's series of oral opinions did not discuss, nor did they cite to, the precedents in James, Verdicchio, or Fowler.  The motion transcripts reflect the court only briefly alluded to Sholtis without discussing that case in depth.  The court's rulings do not reflect a sufficient recognition that "[i]n [the] toxic-tort context, 'proof that a defendant's conduct caused a [plaintiff's] injuries is more subtle and sophisticated than proof in cases concerned with more traditional torts.'"  James, 155 N.J. at 299 (quoting Landrigan, 127 N.J. at 413).

Plaintiff does not have to show that the sole, or even primary, factor in causing his injuries was his post-2004 methyl bromide exposure to survive summary judgment against Gloucester; he must only make out a prima facie case that the post-2004 exposure was a substantial factor in causing his injuries.  Ibid. We repeat that our courts have stated that a substantial factor "'need not be the sole or primary factor producing the injury'" and that the substantial factor test "'covers the situation'" as here "'where there may be several substantial factors contributing to the same result.'"  Verdicchio, 179 N.J. at 24-25 (quoting J.D. Lee & Barry A. Lindahl, Modern Tort Law:  Liability & Litigation § 4.03, 4-4 (West Group 2002)).  Thus, even if plaintiff's pre-September 2004 exposure was

a substantial factor in causing his injuries, that does not preclude that his post-September 2004 exposure could <u>also</u> be a substantial factor in causing his injuries, which the trial court failed to acknowledge or address.

Gloucester argues the <u>Sholtis</u> standard does not apply here because this case involves a single toxic product. It is true that this case is not wholly analogous to many of the occupational toxic-tort cases utilizing <u>Sholtis</u> that have involved multiple toxic products and multiple defendants. However, as we noted above, our Supreme Court has clarified that the <u>Sholtis</u> test is "adaptable to varying scenarios and should not be rigidly and inflexibly applied." <u>Fowler</u>, 251 N.J. at 334.

Furthermore, the <u>Sholtis</u> test is just "an articulation of what constitutes a substantial factor for purposes of determining proximate cause in an occupational exposure setting." <u>Id.</u> at 336. Thus, while the facts are not identical to those in several of the cases applying <u>Sholtis</u>, the concept behind <u>Sholtis</u> is applicable here, since there are multiple players in this case, including Gloucester, Western, and Del Monte–all of whom were involved in exposing plaintiff to methyl bromide over the course of his career, the cumulative exposure of which plaintiff asserts caused his injuries. The factual record reasonably supports that plaintiff's exposure to the toxic chemical during his

release-eligible years at Gloucester Terminal was (1) frequent, (2) regular, and (3) in close proximity to the cold storage area where the gas was emitted. See Sholtis, 238 N.J. Super. at 31.

The fact that Dr. Laumbach in his expert report attested to causation caused by plaintiff's occupational exposure "while working as an expediter for PSA and Del Monte" does not mean that plaintiff's exposure at PSA was inconsequential. (Emphasis added).

Dr. Lynch's report, meanwhile, temporally addressed plaintiff's chronic exposure to methyl bromide during his work tenure at the Gloucester terminal "between 2006 and 2017." Dr. Lynch notably "estimate[d] that [plaintiff's] exposure during the approximate 11 years of his employment at Gloucester terminal conservatively ranged between 2 to 20 [ppm] for several hours of each typical workday within the cold box" due to off-gassing from the fumigation during the 2006 to 2017 timeframe. Thus, Dr. Lynch's expert report substantiates that plaintiff was in frequent, regular, and close proximity with methyl bromide while working at the Gloucester terminal post-2004. See Sholtis, 238 N.J. Super. at 31.

Viewing the record in the light most favorable to plaintiff, his experts can establish in relation to Gloucester that his post-2004 exposure was a substantial

factor in causing or exacerbating his medical symptoms.  See James, 155 N.J. at 299.

Dr. Laumbach's report attested that even short-term exposure to methyl bromide could cause "[h]eadaches, loss of appetite, nausea, vomiting, visual disturbances, and fatigue and weakness," symptoms which plaintiff experienced. More importantly, Dr. Laumbach stated that longer-term exposure to methyl bromide could cause "neurological signs and symptoms in humans" and "has been associated with a variety of central and peripheral nervous system disorders including mental confusion, lethargy, loss of initiative, depressed libido, personality changes, apathy, amnesia, aphasia, blurred vision, dysarthria, polyneuropathy, and muscle weakness."  Plaintiff's deposition provided abundant evidence of these multiple severe injuries.

Both Drs. Katz and Laumbach's respective reports concluded that plaintiff's injuries were consistent with long-term exposure to methyl bromide. Dr. Katz concluded that plaintiff's long-term exposure to methyl bromide had "le[]d to the development of slowly progressive long-term degenerative processes in the peripheral nervous system" that particularly manifested in muscle weakness in plaintiff's right fingers, hand, and arm.  Dr. Laumbach similarly concluded there was "strong support for a causal association between

occupational exposure to methyl bromide and [plaintiff's] peripheral neuropathy and central nervous system symptoms."

Thus, plaintiff's' experts emphatically opined that he had injuries consistent with long-term exposure to methyl bromide. Even if his short-term symptoms such as headaches and nausea were caused by methyl bromide exposure before 2004, which Gloucester cannot be liable for, his long-term exposure to methyl bromide from 2004 until 2017 at the Gloucester terminal was also a factor in "exacerbating" plaintiff's injuries, resulting in his right hand and arm degeneration and central nervous system issues. See James, 155 N.J. at 299. The record likewise supports an inference that plaintiff's exposure for about a decade from 2007 to 2017 when Western was the fumigator on site could be regarded as a substantial factor in producing his medical symptoms.

In sum, viewing the summary judgment record de novo, in a light most favorable to plaintiff, we conclude there are genuine and material facts presented by his three experts' reports to create jury questions of medical causation. Even if one were to confine Gloucester's potential causation role to the period from September 2004 to May 2017, and to confine Western's role from approximately

2007 to May 2017, the reports of plaintiff's experts[11] collectively provide sufficient evidence for a jury to assess the substantiality of each defendant's' contribution to the harm.

Burdens of Proof and Allocation of Responsibility

This brings us to a discussion of burdens of proof and the potential allocation of responsibility. Given that, as we ruled in Part II(B), the general release limits Gloucester's potential liability to claims arising after September 2004, Gloucester argues that plaintiffs bear the burden of proving the extent of the harms caused after that date. In fact, the burden rests on Gloucester, for two reasons.

First, Gloucester has invoked the release as an affirmative defense limiting its liability. As a matter of black-letter law, defendants commonly have the burden of proving the merits of the affirmative defenses they assert. See, e.g., Roberts v. Rich Foods, Inc., 139 N.J. 365, 378 (1995) (alteration in original) ("'When an affirmative defense is raised [in a civil case], the defendant normally has the burden of proving it'"); Vill. of Ridgefield Park v. N.Y., Susquehanna and W. Ry. Corp., 318 N.J. Super. 385, 395 (App. Div. 1999) ("A defendant

_____

[11] We do not foreclose defendants from moving in limine to bar or limit the admissibility of any of plaintiff's experts' testimony on net opinion or other grounds.

relying on an affirmative defense has the burden of persuasion by a preponderance of the evidence").

Second, as we noted above, toxic-tort case law in our state, upon the presentation of a prima facie case of causation, shifts the burden "to the culpable defendant who should be held responsible for all damages unless he can demonstrate that the damages for which he is responsible are capable of some reasonable apportionment and what those damages are." Sholtis, 238 N.J. Super. at 28 (quoting Fosgate v. Corona, 66 N.J. 268, 272-73 (1974)). This principle applies to both Gloucester and Western. It imposes a burden on each of them, if they seek a reduction of damages for exposures that occurred during earlier time frames or caused by a different actor, to prove they are entitled to such a "reasonable apportionment," as well as the extent of any such apportionment. The apportionment could also address comparative differences in the respective roles of Gloucester and Western vis-à-vis one another.

To carry out this burden-shifting principle, the trial court may consider crafting case-specific jury instructions, along with special interrogatories on the verdict form, that would assist a jury in making a fair allocation or reduction of damages from exposures that preceded Gloucester's September 2004 release and Western's approximate involvement at plaintiff's workplace starting in or about

2007. We leave it to the discretion of the trial court in fashioning such appropriate jury charges and a tailored verdict form with the input of trial counsel.

### The Non-Dispositive Relevance of the OSHA 20 ppm Standard to Ordinary Negligence

Defendants urge they cannot be found liable for negligence because there is no proof that the exposure levels at the terminal while plaintiff was working there ever exceeded the EPA standard of 20 ppm, as set forth in 29 C.F.R. § 1910.1000(a) (denoted as "Table Z-1"). That data is not, however, dispositive of reasonable care, for reasons elaborated by plaintiff's' scientific experts. For one thing, testing protocols were not instituted until 2012, many years after plaintiff began working there and was exposed to off-gas discharges. In addition, the areas where plaintiff worked were generally not tested in the afternoons, even though testimony showed that off-gassing can continue for up to seventy-two hours after the fruit is treated. Also, the testing data sometimes, albeit not frequently, produced levels above the 5 ppm mark established under the FASSOP in 2012. Plaintiff's' experts further identified other government or industry standards more stringent than the OSHA 20 ppm, or those pertaining to average all-day exposures rather than episodic peaks.

A-3914-23

Most importantly, the OSHA 20 ppm level, while surely relevant and admissible evidence at trial, does not dictate civil liability for ordinary negligence. See Costantino v. Ventriglia, 324 N.J. Super. 437, 444 (App. Div. 1999) (noting an "OSHA regulation was an available but not a required standard of care against which to measure defendants' conduct"). Depending on the proofs adduced, a jury would be free to conclude a company's behavior in safeguarding its employees from toxic methyl bromide exposure was unreasonable despite the company's compliance with the OSHA 20 ppm standard.[12]

Conclusion Regarding Causation Issues and Summary Judgment

For these multiple reasons, the trial court erred in granting summary judgment to Gloucester and Western. As we have shown, the court failed to conduct a fulsome analysis of the less stringent causation standards that govern toxic-tort occupational exposure cases in New Jersey. The court also did not consider plaintiff's expert reports in a light most favorable to them as the non-moving parties. Summary judgment on liability is consequently reversed.

---

[12] But see our discussion in Part II(D), infra, concerning punitive damages.

A-3914-23

D.

Finally, we consider the motions of Western and Gloucester for partial summary judgment dismissing plaintiff's demands for punitive damages. Although the court granted Western's motion but denied as moot Gloucester's motion, we consider both motions together, discerning no need for a remand as to Gloucester since the analysis substantially is the same.

The Punitive Damages Act ("PDA"), N.J.S.A. 2A:15-5.9 to -5.17, was enacted "to establish more restrictive standards with regard to the awarding of punitive damages." Pavlova v. Mint Mgmt. Corp., 375 N.J. Super. 397, 403 (App. Div. 2005). The PDA "requires an award of compensatory damages as a statutory precedent for an award of punitive damages. . ." Ibid.; N.J.S.A. 2A:15-5.13(c). In most respects, the PDA "codified the common law . . . which limited punitive damages to only 'exceptional cases . . . as a punishment of the defendant and as a deterrent to others from following his [or her] example.'" Pavlova, 375 N.J. Super. at 404 (quoting Di Giovanni v. Pessel, 55 N.J. 188, 190 (1970)).

To justify the imposition of punitive damages, N.J.S.A. 2A:15-5.12(a) instructs that:

> Punitive damages may be awarded to the plaintiff only if the plaintiff proves, by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or

60

omissions were <u>actuated by actual malice or accompanied by a wanton and willful disregard</u> of persons who foreseeably might be harmed by those acts or omissions. This burden of proof <u>may not be satisfied by proof of any degree of negligence including gross negligence</u>.

[(Emphasis added).]

See also <u>Nappe v. Anschelewitz, Barr, Ansell & Bonello</u>, 97 N.J. 37, 49 (1984) (same).

Wanton and willful disregard is defined in the PDA as "a deliberate act or omission with knowledge of a high degree of probability of harm to another and reckless indifference to the consequences of such act or omission." N.J.S.A. 2A:15-5.10. The PDA provides a non-exclusive list of factors the factfinder must consider in determining whether to award punitive damages, including:

(1) The likelihood, at the relevant time, that serious harm would arise from the defendant's conduct;

(2) The defendant's awareness or reckless disregard of the likelihood that the serious harm at issue would arise from the defendant's conduct;

(3) The conduct of the defendant upon learning that its initial conduct would likely cause harm; and

(4) The duration of the conduct or any concealment of it by the defendant.

[N.J.S.A. 2A:15-5.12(b).]

61

"Case law considers these same types of factors." Pavlova, 375 N.J. Super. at 404.

"[M]ere negligence, however gross, is not enough" but "the standard signifies something less than an intention to hurt." Id. at 405. "[T]he standard can only be established if the defendant knew or had reason to know of circumstances which would bring home to the ordinary reasonable person the highly dangerous character of his or her conduct." Ibid. To that end, a plaintiff "may not recover punitive damages by 'recasting merely negligent conduct as "willful and wanton."'" Edwards v. Our Lady of Lourdes Hosp., 217 N.J. Super. 448, 460 (App. Div. 1987) (quoting Entwistle v. Draves, 102 N.J. 559, 562 (1986)).

Here, we conclude that, even affording plaintiff all reasonable inferences, there is nothing in the record to support his claim that Western's conduct rose to the level of "wanton and willful disregard" to warrant punitive damages. N.J.S.A. 2A:15-5.12(a). Plaintiff argues that Western acted with wanton and willful disregard for his safety to warrant punitive damages because it knew methyl bromide could off-gas, but Western generally only took one air sample for it in the morning in the cold storage boxes at Pier 8 and Pier 9 and generally

not in the afternoon.  Plaintiff contends Western should have conducted "additional testing throughout the day" and that its failure to do so was reckless.

As we noted above, this conduct does not rise to the level of wanton and willful disregard to warrant punitive damages.  The record shows that various Gloucester and Western employees did know that methyl bromide could off-gas.  Moreover, Quigley, Gloucester's former director of safety and loss control, stated that once he joined the task force regarding how methyl bromide was being handled around 2011 and learned that methyl bromide could off-gas, Gloucester began air sampling for methyl bromide in the cold storage boxes of Pier 8 and Pier 9, rather than only sampling in the sheds where the actual fumigation occurred.

Based on that information, Western, in conjunction with Gloucester, developed the FASSOP for air sampling for methyl bromide in the cold storage boxes, and set limits for how much methyl bromide would be permissible.  Those limits included Western notifying Gloucester if the methyl bromide reading in the cold storage box was above 5 ppm and restricting access to the cold storage boxes if the methyl bromide reading was above 10 ppm.  As part of the FASSOP, Western would sample the air for methyl bromide in the cold storage boxes in the morning "prior to anyone entering" the cold storage boxes for work.

A-3914-23

As the trial court found, there is nothing "wanton" or "reckless" inherent to that procedure. No Western or Gloucester employee who was deposed testified that they actively ignored the 5 or 10 ppm thresholds contained in their joint BMP and FASSOP for methyl bromide sampling in the cold storage boxes.

Moreover, as we noted above, OSHA's permissible exposure limit is 20 ppm, 29 C.F.R. § 1910.1000, and Reichert, Western's fumigation director, confirmed that the five and ten ppm thresholds were site-specific to Gloucester. Silverstein, Western's industrial hygienist, stated that he reviewed the logs and concluded that "none of the sampling data reviewed indicated any exposures above the OSHA standard of 20 ppm which is the exposure limit for workers like [plaintiff]." Plaintiff does not argue that he was ever exposed to methyl bromide levels greater than OSHA's permissible exposure limit of 20 ppm and conceded in his appellate brief that the methyl bromide samples in the logs from the cold storage boxes "do not exceed OSHA permissible levels."

Overall, because plaintiff cannot show that Western acted with either actual malice or wanton and willful disregard to his safety through its cold storage box sampling procedures, punitive damages are not warranted. N.J.S.A. 2A:15-5.12(a); Nappe, 97 N.J. at 49. Hence, the trial court properly granted summary judgment to Western on plaintiff's punitive damages claim.

64

Similar reasoning pertains to the punitive damages sought against Gloucester. We need not repeat here the rationale concerning Western above. Many of those same factual events within the chronology extend to Gloucester's managers and supervisors as well. Suffice it to say that there is insufficient evidence to support the imposition of punitive damages against Gloucester, even viewing the record in a light most favorable to plaintiffs.

III.

To the extent we have not addressed them, all other arguments raised by plaintiffs lack sufficient merit to warrant discussion in this opinion. R. 2:11-(e)(1)(E).

For the reasons stated, we reverse the entry of summary judgment on liability as to both defendants, and remand for further proceedings. We affirm, however, the court's construction of Gloucester's general release and also its denial of punitive damages.

Reversed in part, affirmed in part, and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division